529 So.2d 595 (1988)
P.L. BLAKE
v.
GANNETT COMPANY, INC., Gannett News Service, Inc., and Mississippi Publishers Corporation.
No. 57341.
Supreme Court of Mississippi.
May 25, 1988.
*596 Fred D. Thompson, Thompson & Bussart, Nashville, Tenn., James W. Burgoon, *597 Jr., Fraiser, Burgoon & Abraham, Greenwood, for appellant.
Luther T. Munford, Phelps, Dunbar, Marks, Claverie & Sims, John C. Henegan, R. Andrew Taggart, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, for appellees.
En Banc:
PRATHER, Justice, for the Court:
P.L. Blake filed a complaint on December 7, 1984, in the Circuit Court of Hinds County, against Gannett Co., Inc., Gannett News Service, Inc. and Mississippi Publishers Corporation alleging libel and false light invasion of privacy. The action is brought as a result of articles written in the defendants' newspaper and newswire service concerning the Federal Farm Loan Program of the Farmers Home Administration.
After extensive discovery, the trial judge issued an opinion granting the defendants' motion for summary judgment, holding that the plaintiff was a limited purpose public figure who failed to show actual malice on the defendants' part to impose liability on them. In addition, the trial court held that the plaintiff had failed to produce evidence of falsity, and therefore, his libel and false light invasion of privacy actions failed. From this ruling for summary judgment, P.L. Blake appeals and assigns as error the following findings of the Hinds County Circuit Court:
(1) AS A MATTER OF LAW, APPELLANT P.L. BLAKE IS A VORTEX PUBLIC FIGURE AND THUS HELD TO THE ACTUAL MALICE STANDARD OF PROOF; AND
(2) NO GENUINE ISSUE OF MATERIAL FACT EXISTS REGARDING APPELLEES' KNOWLEDGE OF OR RECKLESS DISREGARD AS TO THE FALSITY OF THEIR STATEMENTS CONCERNING APPELLANT; AND
(3) AS A MATTER OF LAW, THE PUBLISHED STATEMENTS CONCERNING APPELLANT AND HIS CORPORATIONS ARE NOT FALSE AND THEREFORE NOT LIBEL; AND
(4) AS A MATTER OF LAW, APPELLANT'S CLAIM FOR FALSE LIGHT INVASION OF PRIVACY MUST FAIL WHERE BASED UPON THE SAME SET OF FACTS AS THE DISMISSED LIBEL CLAIM; AND
(5) AS A MATTER OF LAW, PUBLICATION OCCURRED ON DECEMBER 4-6, 1983, AND APPELLANT'S SUIT IS THUS BARRED BY THE MISSISSIPPI STATUTE OF LIMITATIONS; AND

I.

A.
On December 7, 1984, P.L. Blake (hereafter referred to as "Blake"), a Greenwood, Mississippi resident, filed suit in the Hinds County Court for libel and invasion of privacy against (1) Mississippi Publishers Corporation, (hereinafter MPC), the owner of the Jackson based newspaper, The Clarion-Ledger, (2) Gannett News Service, Inc., (hereinafter GNS), a national newswire service headquartered in Arlington, Virginia, and (3) Gannett Co., Inc., (hereinafter GC), the parent corporation of MPC and GNS, which are wholly owned subsidiaries. The suit arose out of a series of newspaper articles written and distributed by Gannett News Service and published in The Clarion-Ledger.
The articles published by GNS concerned the Farmers Home Administration (hereafter "FmHA"), a federal agency with state offices nationwide. The authors of the articles, Mark Rohner ("Rohner") and Dennis Camire ("Camire"), both GNS investigative reporters, addressed the federal farm loan program and FmHA's alleged mismanagement of funds in approving loans for borrowers of substantial net worth.
More specifically, the reporters focused on the FmHA farm loan program as administered within the State of Mississippi. Subsequently, GNS published a series of articles from December 4, 1983, to October 2, 1984. The series featured most of Mississippi's ten largest FmHA borrowers, including the DeWitt Corporation ("DeWitt") owned by P.L. Blake. DeWitt owed FmHA *598 $3.5 million dollars and was the fifth largest borrower in the state.
Regressing in time, the origin of this series was a May 1983 Congressional Hearing. At that hearing, Dennis Camire learned that federal auditors had recently criticized FmHA programs. Subsequently, GNS editors assigned Reporter Mark Rohner to work with Camire on a series of stories concerning agency practices. Rohner had worked as an agriculture reporter in the GNS Washington office since 1978.
The reporters began their 1983 investigation by collecting a series of audits prepared by the Office of Inspector General of the United States Department of Agriculture. (USDA) These audits criticized FmHA for failing to heed agency regulations in making loans to wealthy borrowers.
Although this audit was revealing concerning FmHA loans, the DeWitt file was not examined by the Government in the course of this selective audit.
Shortly after the Congressional Hearings, Camire received from a Congressional office an article from The Greenwood, Mississippi Commonwealth concerning persons identified as the "most controversial" FmHA borrowers in LeFlore County. The article includes the name of P.L. Blake.
Following up on this article, the reporters, using the Federal Freedom of Information Act, 5 U.S.C. § 552(a), obtained the FmHA's county loan file for Blake's company, DeWitt. The reporters used the county loan information to do further investigation into DeWitt's other business ventures in Mississippi and Texas.
With all this information in hand, GNS reporters prepared a fourteen article series. Following the editing of these articles in Washington, GNS published the articles by sending them by wire to Gannett and non-Gannett organizations. The initial articles went out over the GNS wire on December 4-6, 1983.
Therein, Blake complains on appeal about these particular articles:
(1) On December 11, 1983, in The Clarion-Ledger/Jackson Daily News "The P.L. Blake empire has good credit in Washington," a GNS article.
(2) On January 12, 1984, The Clarion-Ledger published an editorial headlined "Hopeful Sign". It concerned the FmHA series published in December, 1983. The editorial does not refer to Blake or any individual.
(3) On January 20, 1984, GNS reprinted its series of articles in a special report entitled: "FmHA The Golden Yoke." The series won some of the Nation's top awards for economic and agricultural reporting.
(4) On March 3, 1984, The Clarion-Ledger published a GNS article "FmHA Investigating Greenwood borrower," based on the FmHA reaction to the initial GNS series.
Before August 30, 1984, Blake did not complain to any of the defendants about any of these articles. On that day his counsel wrote a letter to the defendants identifying certain statements alleged to be false and defamatory. The defendants, GNS, responded on September 12, 1984. They maintained that the statements were true and that Blake's characterization of these statements were inaccurate. This suit was filed on December 7, 1984.

B.
The following is a composite of those facts of which Camire and Rohner were aware when they wrote the series and those facts which surfaced during discovery. Blake, who is the sole stockholder in DeWitt, bought the company some time prior to 1977. DeWitt, in turn, is the sole stockholder and owner of its subsidiary companies. By November, 1982, DeWitt's wholly owned subsidiaries were: PLB Grain Storage Corporation (PLB Grain) (a Texas grain elevator complex); Quiver River Plantation (Quiver) (a catfish farm); Cupid Corporation (Cupid) (a catfish processing plant); and, Delta Rice Farms (Delta Rice) (cropland farming).
Tax returns indicate that, in 1977, DeWitt had total assets of $3,072,844 and, in 1983, DeWitt's listed assets were $42,436,529. DeWitt's 1982 Financial Statement *599 shows income revenues from the grain storage enterprise of $6,065,160 and income revenues from crop production of $1,093,125. Also in 1982, DeWitt's stockholders' equity in PLB Grain was $8,344,189.
DeWitt borrowed money from the FmHA from 1977 through the 1983-84 publication of the articles here at issue. The FmHA has many regulations governing loans to individual and corporate applicants. Crucial to this Court's inquiry are the following FmHA regulations. First, loan applicants must be "unable to obtain sufficient and suitable credit elsewhere" taking into account "all assets" of the corporation and its shareholders. See 7 CFR § 1945.56(b)(1).[1] Second, corporate borrowers must apply to not fewer than five (5) "conventional lending" institutions before coming to the FmHA. Id. § 1945.56(b)(2)(i)(A)(ii). Third, FmHA borrowers must sell all or part of "non-essential non-farm assets to meet a portion of the applicants' needs". Id. § 1945.56(b)(2)(i)(4). Finally, corporate borrowers must derive fifty percent (50%) of their gross incomes from farming. Id. § 1945.54(a)(11).
DeWitt's FmHA loan file contains the following information. On April 25, 1983, DeWitt was allowed to roll over $3.5 million in past due FmHA debts. Also in early 1983, DeWitt obtained an $850,000 production loan. The file also indicates that DeWitt could not obtain needed funds using its own resources. In 1983, four lenders refused to loan DeWitt money. However, the stated reason for two lenders' refusals was that they did not make agricultural production loans. Various Farm and Home Plans contained in the file indicate that DeWitt's net worth had grown from $25,000 in 1977 to $1,705,247 in 1982. A December 15, 1982, plan shows that DeWitt had no stock assets and projected no non-farm income. The file shows that, in 1983, DeWitt reported the organization of three of its four subsidiaries, omitting PLB Grain, which had been a wholly owned subsidiary of DeWitt since September 24, 1981.
PLB Grain owned one of the largest, if not the largest, grain storage facilities in the United States. It had contracted with the Commodity Credit Corporation (CCC) to store 21.5 million bushels of grain. In order to receive the contract, PLB had indicated to the CCC that it had a net worth of at least $5 million. The surplus grain stored for the government by PLB under the CCC contract became a national story on October 18, 1983. The controversy involved the quantity and quality of the grain stored by PLB Grain. Texas officials charged that the quality of the grain had deteriorated substantially. USDA officials claimed that it had not deteriorated. Later, in 1984, CCC determined that there were quality and quantity problems with the grain stored in PLB's elevators. State FmHA officials knew that Blake had an interest in a Texas grain storage facility, but did not know the exact nature of that interest. Information concerning PLB Grain was never included in FmHA loan applications.
When Blake was interviewed by the two reporters, he told them that, at DeWitt, "We're still struggling our a____ off trying to make ends meet." However, DeWitt had accounts receivable in the amount of $1.6 million as the result of a loan to Blake and his wife. Also, at the end of 1982, DeWitt had securities and certificates of deposits valued at $390,000.
Blake's position is that at the time he was requesting FmHA loans he did not know that he was not furnishing the FmHA with enough information. In fact, Blake stated, during an April 9, 1985, deposition, *600 that it was not until that date that he became aware of certain FmHA requirements, including the requirement that borrowers sell or mortgage all assets not essential to a sound farming operation.

II.

DID THE CIRCUIT COURT ERR IN FINDING THAT P.L. BLAKE IS A VORTEX PUBLIC FIGURE AND THUS HELD TO THE ACTUAL MALICE STANDARD OF PROOF?

DID THE TRIAL COURT ERR IN FINDING THAT NO GENUINE ISSUE OF MATERIAL FACT EXISTS REGARDING APPELLEES' KNOWLEDGE OF OR RECKLESS DISREGARD AS TO THE FALSITY OF THEIR STATEMENTS CONCERNING APPELLANT?
This Court looks first at whether the circuit court's finding that P.L. Blake is a limited purpose public figure or a vortex public figure was in accord with the Mississippi precedents in libel actions and not violative of the federal constitutional guarantees.
The cornerstone of this Court's analysis begins with the Mississippi Constitution which describes freedom of the press as a sacred right. Miss.Const. art. 3, § 13. The United States Constitution affords the same guarantee in its First Amendment acknowledging the freedom of speech and of the press. However, these freedoms do not protect libelous utterances. With respect to public officials, special rules apply, and in the landmark federal case, New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 686 (1964), the Supreme Court announced the federal constitutional standard of proof by which a public official must prove a libel action.
The federal rule of New York Times, supra, was that a public official was prohibited "from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice'  that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S., pp. 279-80, 84 S.Ct., p. 726, 11 L.Ed.2d, p. 706. The holding of New York Times, supra, was subsequently broadened to include "public figures" who were not public officials. Public figures were held to the same standard because their role "often play[ed] an influential role in ordering society." Curtis Publishing Co. v. Butts, 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967).
This same holding is found in Mississippi precedent that pre-dates the New York Times decision. Edmonds v. Delta Democrat Publishing Co., 230 Miss. 483, 93 So.2d 171, 173-74 (1957) held that:
When a person comes prominently forward in any way and becomes a public or quasi-public figure, he invites free expression of public opinion, including criticism. When such criticism is in the form of an opinion, relates to public assertions or acts rather than to the individual in his private affairs, is fair in the sense that the reader can understand the factual basis for the opinions containing the criticism, and the publication relates to a matter of public interest, then the occasion is conditionally privileged; and no action will lie for such publication no matter how severe the criticism or unfavorable the comments, if the privilege is not abused... .
... .
Whether the privilege has been abused is usually a question of whether the criticism was made with an honest purpose or was made with malice in the sense of spite or ill will, or culpable recklessness or negligence... .
The Edmonds case, supra, acknowledged that, not only were "public figures" subject to the malice standard of proof, but also "quasi-public officials." The same concept was carried forward in Ferguson v. Watkins, 448 So.2d 271 (Miss. 1984) when this Court using an analogous term of "vortex public figure" defined such person as "one who though otherwise a private figure becomes active or involved in a matter of public concern."
*601 Admittedly, P.L. Blake is not a public official or public figure for all purposes. It was held by the trial court that he was a limited purpose public figure for the limited purpose of comment on his receipt of federal loan for farming purposes.
"The Supreme Court has identified two classes of public figures in addition to government officials: general purpose and limited purpose public figures." Tavoulareas v. Piro, 817 F.2d 762 (D.C. Cir.1987). Is P.L. Blake a limited purpose public figure? This appeal is for the purpose of answering this question.
This Court looks to the federal decisions to ascertain the test applied to determine a person's status. The federal decision following New York Times first applied the rule that it was the general or public nature of the issue, rather than the "public" status of the alleged defamee that determined application of the malice standard. Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). However, in a later federal case, Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the federal court rejected the "general or public interest" test in determining status of an alleged defamee. Several reasons for this withdrawal from its former position were noted. The Supreme Court acknowledged that judges would be required to decide on an ad hoc basis what issues were of general or public interest. Additionally a subject matter classification was thought to result in an improper balance between the competing parties. In Gertz v. Robert Welch, Inc., supra, the Court recognized an individual's right to protection of his good name and the legitimate interest in redressing a wrong caused by defamation: "[P]rivate individuals lack the effective opportunities for rebuttal... ."
The Gertz Court held the test to be used in status determination to be:
It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.
418 U.S. at 352, 94 S.Ct. at 3013, 41 L.Ed.2d at 812. The Court identified ways in which a person becomes a public figure for First Amendment purposes.
For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved... ." 418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808.
This Court in Ferguson v. Watkins, 448 So.2d 271 (Miss. 1984) adopted a similar test for determination of how a private figure becomes a quasi or vortex public figure in the following language:
Such a person is one who is otherwise a private figure but who thrusts himself or becomes thrust into the vortex of a matter of legitimate public interest.
This Court holds that Farmers Home Administration and its federal lending policies from federally funded programs are without question matters of legitimate public interest. Ferguson, supra. But in the instant case, Blake did not "thrust himself" or his news into a matter of legitimate public concern. He did nothing to interject himself into the investigation. Then, the question presents itself whether Blake became thrust into the vortex of this subject and became a limited purpose public figure.
The answer comes from Blake's individual participation in the FmHA investigation giving rise to the alleged defamation. Gertz, supra. Mr. Blake was a farmer and businessman who borrowed money from FmHA. The local newspaper in Greenwood, Mississippi, named Blake as one of the most controversial FmHA borrowers. Blake did not thrust himself or his views into public controversy to influence others or assume any role of public prominence nor have access to the media.
This factual situation is similar to the case of Hutchinson v. Proxmire, 443 U.S. *602 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), wherein a scientist receiving federal funds was held not to be a public figure. In analyzing that defamee's participation, the Supreme Court held:
Hutchinson did not thrust himself or his views into public controversy to influence others. Respondents have not identified such a particular controversy; at most, they point to concern about general public expenditures. But that concern is shared by most and relates to most public expenditures; it is not sufficient to make Hutchinson a public figure. If it were, everyone who received or benefited from the myriad public grants for research could be classified as a public figure  a conclusion that our previous opinions have rejected... .
443 U.S. at 135, 99 S.Ct. at 2688, 61 L.Ed.2d at 431.
This Court reaches the same conclusion in the instant case. The focus of the investigation was the FmHA loan practices; the focus was not P.L. Blake specifically, but he was one of the subjects in the overall investigation of general public expenditures. If, as in Hutchinson, supra, borrowing money from a federally funded program makes a person a limited purpose public figure, the group would be extremely large.
Therefore, this Court concludes that Blake is a private, rather than a limited purpose public, figure. However, reversal is not required, because the trial court was correct in its ruling on a more fundamental issue.

III.

DID THE CIRCUIT ERR IN FINDING THAT THE PUBLISHED STATEMENTS CONCERNING APPELLANT AND HIS CORPORATIONS ARE TRUE?

DID THE CIRCUIT COURT ERR IN FINDING THAT APPELLANTS' CLAIM FOR FALSE LIGHT INVASION OF PRIVACY MUST FAIL WHERE BASED UPON THE SAME SET OF FACTS AS THE DISMISSED LIBEL CLAIM?
Blake's complaint alleged some fifteen (15) instances of defamation by Gannett and Mississippi Publishers Corporation. With regard to certain statements contained in the articles, the trial court found that there was no evidence by which a factfinder could conclude that the statements were false. With regard to several headlines and an editorial, the trial court concluded that they were either not directed at Blake or were protected opinion. On appeal, Blake challenges the lower court's ruling in relation to only nine (9) of the original alleged instances of libel. Blake argues that the statements contained in the articles and headlines were not substantially true and were actionable as libel by implication.
A claim of defamation requires that the following elements be established:
(1) a false and defamatory statement concerning the plaintiff;
(2) an unprivileged publication to a third party;
(3) fault amounting at least to negligence on the part of the publisher; and,
(4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.
Chatham v. Gulf Pub. Co., Inc., 502 So.2d 647, 649 (Miss. 1987).
In defamation actions, then, the threshold question with which this Court is faced, is whether the published statements are false. Truth is a complete defense to an action for libel. Fulton v. Mississippi Publishers Corp., 498 So.2d 1215, 1217 (Miss. 1986); Prescott v. Bay St. Louis Newspapers, Inc., 497 So.2d 77 (Miss. 1986) quoting Rinsley v. Brandt, 700 F.2d 1304, 1307 (10th Cir.1983); Smith v. Byrd, 225 Miss. 331, 83 So.2d 172, 174 (1955); Conroy v. Breland, 185 Miss. 787, 189 So. 814, 816 (1939); and Miss. Const. Art. 3, § 13 (1890). This Court has also held that the plaintiff has the burden of proving falsity. Reaves v. Foster, 200 So.2d 453 (Miss. 1967).
*603 Recently, the United States Supreme Court held that First Amendment restrictions mandate that the plaintiff in a defamation action bear the burden of proving falsity. Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 776, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783, 792 (1986). Furthermore, all that this Court requires is that the statements be "substantially true". Smith v. Byrd, 83 So.2d at 175 (published statement which reported that a sheriff had shot a man was substantially true even though it was a sheriff's deputy who actually fired the shot).
If the published statements are false, a plaintiff in a defamation action, regardless of his status as a private or public figure, must clear two additional burdens. These burdens flow from the common law definition of defamation, in the form of libel, as:
Any written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community ...
Chatham, 502 So.2d at 650; Ferguson, 448 So.2d at 275 (and cases cited therein). The Ferguson opinion goes on to describe these burdens.
Two restrictions upon the action for defamation are and must be strictly enforced. First, the words employed must have clearly been directed toward the plaintiff. Beyond that, the defamation must be clear and unmistakable from the words themselves and not be the product of innuendo, speculation or conjecture.
Ferguson, 448 So.2d at 275. It must be reiterated that, absent a showing that the statements are false and clearly directed toward the plaintiff, whether those statements are defamatory becomes irrelevant. Likewise, if the statements are true and/or are not clearly directed toward (concerning) the plaintiff, this Court does not reach the question of whether those statements are defamatory. Because we conclude that there is no evidence of falsity, we do not reach Blake's claim that the published statements are defamatory by implication.
Blake complains of the following language contained in a Clarion-Ledger editorial published on January 12, 1984:
As chronicled in a December series of articles by Clarion-Ledger Reporter Dennis Camire and his Gannett News Service partner, Mark Rohner, the FmHA loan program has been the victim of fraud and waste costing the taxpayers billions of dollars.
Neither Blake's nor DeWitt's name appears anywhere in this editorial. As such, the statement is not "clearly directed toward" Blake and there can be no libel.
Next, Blake complains of four statements included in two articles. The first article, published December 11, 1983, and headlined "The P.L. Blake empire has good credit in Washington" contains the following allegedly libelous statements.
To the Farmers Home Administration, Blake is the cash-strapped farmer whose agri-business corporations have, since 1975, borrowed almost $11 million in lowcost government loans by convincing the agency they're too broke to get commercial credit.

Since 1980, the Federal Commodity Corp. has been paying a separate Blake company more than $17 million to store surplus government corn in huge Texas elevators formerly owned by Billie Sol Estes. To land the lucrative  and unique  contract, Blake had to convince Commodity Credit that he was flush. [emphasis added]
* * * * * *
Blake's FmHA borrowing has created some resentment among Leflore County farmers, but the hometown talk is nothing compared to the storm now brewing in Texas and Washington over the nearly 20-3 million bushels of corn in his Texas grain elevators... .
Texas Agriculture Commissioner Jim Hightower charged in October that the corn is being allowed to deteriorate and soon may reach the point where it is no good even for cattle feed... .

*604 The U.S. Department of Agriculture maintains the corn is close to the same quality as that originally stored and does not want to move it. One reason: The government has agreed to pay Blake's warehouse company $3.6 million per year to store a minimum of 13 1/2 million bushels of corn. Under the longterm contract, the government still will have to pay the full amount even it stores less corn. [emphasis added]
* * * * * *
FmHA knows that Blake's DeWitt Corp. has come to it for loans saying it couldn't get credit elsewhere. But officially, the FmHA doesn't know that DeWitt Corp. owns PLB Grain Storage Corp.  which has the fat government grain storage contract. [emphasis added]
* * * * * *
FmHA requires full disclosure of all assets and income before qualifying an applicant for the type of loans DeWitt Corp. has received. But DeWitt  the sole stockholder in PLB Grain Storage since September 1981 and minority stockholder before that  has never disclosed any PLB profits to FmHA.
Blake has not reported, on various financial disclosures and loan applications submitted to FmHA, that his DeWitt Corp. owns stock in PLB.
* * * * * *
Delbert Edwards, Leflore County FmHA Supervisor, and James L. "Pete" Perry, former state director, said they both were vaguely aware of Blake's elevator business, but did not know 100 percent of its stock was owned by their borrower, Blake's DeWitt Corp.
In a March 3, 1984, article, headlined "FmHA investigating Greenwood borrower", Blake complains of the following statements:
The Federal Farmers Home Administration is delving into the financial records of one of its biggest Mississippi borrowers, Greenwood planter, P.L. Blake, in response to disclosures that he had millions of dollars in unreported assets at the same time he was receiving taxpayer-subsidized loans.
Since 1975, Blake's farm corporations have obtained almost $11 million in lowcost government loans by convincing FmHA they were unable to obtain credit anywhere else. But the GNS stories reported that, despite FmHA regulations requiring disclosure of all assets and income, Blake had never told the agency of his 100 percent interest in a huge Texas grain storage complex generating more than $5 million a year in revenue, most of it from a government contract. [emphasis added]
Based on the facts presented to the trial court, these statements are true. At least in November, 1981, and January, 1983, Blake certified to the FmHA that he was unable to provide needed finances from his own resources and unable to obtain reasonable credit. In contrast, through the date of publication of these articles, DeWitt's FmHA file, did not indicate that DeWitt had attempted to sell or mortgage nonessential non-farm assets in order to help meet its needs. In addition, DeWitt's file did not contain any information concerning PLB Grain. The file did not indicate that more than 50 percent of DeWitt's gross income was the result of non-farm operations. Nor did it indicate DeWitt's 100 percent ownership of PLB Grain. The FmHA file includes a notation made by Delbert Edwards, a Leflore County FmHA supervisor, that:
This is not and has not been a sound operation from the start but it has been agreed through the years that the FmHA assistance was necessary to enable him to keep him from losing everything.
The December 11, 1983 article included Blake's assertion that at DeWitt they were struggling to make ends meet. Last, and as Blake concedes, the statement concerning the grain and the federal government contract is true.
Blake's final criticism concerns four headlines. Three of these headlines were published when the original series was reprinted on January 20, 1984, in tabloid form under the title "FmHA: The Golden Yoke". *605 These three headlines take the form of opinion. The first headline, "Pleading poverty, he makes millions" preceded the article which ran originally on December 11, 1983, under the headline "The P.L. Blake empire has good credit in Washington". The second tabloid article headline was "The rich grow richer on farmers' loan plan". The third headline was "Political contributions: the fertilizer for obtaining FmHA loans".
In Whitten v. Commercial Dispatch Pub. Co., Inc., 487 So.2d 843 (Miss. 1986) this Court was faced with a libel question involving a factually erroneous headline. We stated:
"In determining whether a publication is libelous, it must be considered as a whole, and its meaning must be ascertained from the language used, as commonly understood... . Manasco v. Walley, 216 Miss. 614, 63 So.2d [91] at 95 (citations omitted) we reject the defendant's argument that the headline and article must be considered separately because we think no ordinary reader would logically separate the headline from the text.
Whitten, 487 So.2d at 845. The same holds true in the instant case. The headlines and texts must be considered together, as a whole.
Furthermore, opinion statements are actionable only if they clearly and unmistakably imply the allegation of undisclosed false and defamatory facts as the basis for the opinion. Ferguson v. Watkins, 448 So.2d at 276. Ferguson does not hold that opinion statements are actionable if based on undisclosed true facts.
Blake does not point to any undisclosed facts which are false and defamatory, upon which the opinions expressed in the headlines could be based. The appellees argue that all of the facts, both the disclosed and undisclosed facts, provide an ample basis for their opinions. They point to the fact that Blake claimed that his personal net worth grew from $4.2 million to $11.3 million during the relevant time period. They also note that Blake personally received substantial sums from DeWitt. These facts do support the appellees' opinions that Blake was, in fact, making millions while pleading poverty and growing richer while on the farmers loan plan.
Additionally, the record contains numerous facts to support the appellees' characterization of the political contributions as fertilizer. The article accompanying this headline lists some of the political contributions made by thirteen Mississippi FmHA borrowers. Concerning Blake, the article states:
P.L. Blake of Greenwood, President of two corporations that borrowed almost $11 million between 1975 and 1983. He gave $200 to the Mississippi Republican Campaign Committee in 1978; he and his family gave $500 to Bowen in 1980.
These facts are true. Blake also made another small contribution and granted several influential political leaders free use of his private airplane.
More importantly, the article includes the following disclaimer:
Whatever, if anything, they expect in return, some of Mississippi FmHA borrowers always seem to have cash on hand for political contributions.
The facts and disclaimer included in this article leave, to the reader, the role of accepting or rejecting the appellees' opinion that the political contributions were fertilizer. The headline does not "clearly and unmistakably imply the allegation of undisclosed false and defamatory facts as the basis for the opinion". See Ferguson, supra.
Last, Blake challenges the circuit court's ruling on the libelous effect of an October 2, 1984 headline and tagline. The headline reads "Blake found in default on grain storage contract". Immediately following is a tagline which reads "Fraud trial opens, Page 3B". The text of the article concerns Blake's Texas grain elevator operations and does not accuse Blake of fraud or state that he is on trial for fraud. Turning to page 3B the reader learns that a Florida businessman is on trial on charges of fraud in connection with money borrowed from the FmHA. This Court cannot say that the ordinary, average reader, after reading both headlines and texts, could conclude that Blake was being tried for fraud. *606 As such, the headline/tagline and accompanying text neither misstates the facts nor directs allegations of fraud toward Blake.
Because this Court concludes that the published statements were true or protected opinion or not clearly directed toward the appellant, the lower court's grant of summary judgment to the appellees is affirmed. Furthermore, Blake's false light invasion of privacy action was properly dismissed on motion for summary judgment since it was based on the same published statements. As this Court stated in Prescott v. Bay St. Louis Newspapers, Inc., 497 So.2d 77 (Miss. 1986):
Like defamation, truth is a defense to false light, Miss. Const. Art. III, § 13 (1890), and if the statement is not false, little else matters.
Prescott, 497 So.2d at 80.

IV.

DOES THE MISSISSIPPI STATUTE OF LIMITATIONS BAR BLAKE'S LIBEL CLAIM AGAINST GANNETT NEWS SERVICES?
In view of this Court's holding on the previous issues, this assignment of error is not addressed.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
NOTES
[1] 7 CFR § 1945.56(b)(1) in part provides: The applicant's equity in all assets, including, but not limited to, real estate, chattels, stocks, bonds and initial Certificates of Deposit will be considered in determining the applicant's ability to obtain such credit from other sources. Also, the applicant must offer to pledge all assets as security when requesting credit from the other lenders. Co-Operatives, corporations and partnerships and the principal stockholders, and principal partners, both individually and collectively, must be unable to provide the required financing from their own resources or with credit obtained from pledging those resources to other lenders... .