**Lucille Ware Magouirk MITCHELL, Plaintiff–Appellant,**

v.

**RANDOM HOUSE, INC., Lucy de Barbin, and Dary Matera, Defendants–Appellees.**

No. 88–4449

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Feb. 15, 1989.

Mary F. Gibbons, Sam E. Scott, Heidelberg, Woodliff & Franks, Jackson, Miss., for plaintiff-appellant.

John C. Henegan, W. Wayne Drinkwater, Jr., and R. Andrew Taggart, Jackson, Miss., for defendants-appellees.

Before RUBIN, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant Lucille Ware Magouirk Mitchell (Mitchell), a Louisiana citizen, brought this diversity action in the United States District Court for the Southern District of Mississippi against defendants-appellees Random House, Inc. (Random House), a New York corporation, Lucy de Barbin (de Barbin), a Texas citizen, and Dary Matera (Matera), a citizen of Florida, alleging libel, "false light" invasion of privacy and negligent and intentional infliction of emotional distress, all based on statements in a book co-authored by de Barbin and Matera and published by Random House. Mitchell appeals the district

court's dismissal of the complaint for failure to state a claim.

## Context Facts and Proceedings Below

The book in question—*Are You Lonesome Tonight?: The Untold Story of Elvis Presley's One True Love—and the Child He Never Knew* (the book)—recounts the story of the alleged love affair between de Barbin and Elvis Presley. The chapters in the book are written in two parts. The parts written in the first person are by de Barbin. Those that refer to de Barbin in the third person are by Matera. Chapter one of the book dramatically describes de Barbin's unhappy childhood, replete with a father who dies from tuberculosis and a burned down home, when de Barbin was about three years old, a mother who is thereafter forced to work as a maid, and a manipulative and domineering maternal grandmother who "disliked [de Barbin] most of all." As reflected in chapter one, de Barbin's parents and her maternal grandmother were born in France, an uncle continued to live there, her mother "couldn't speak English," de Barbin spoke only French until she was about five or six, the family associated with French immi-

grants and relatives and followed many French customs, and her maternal grandmother "hated America and Americans."

Chapter one informs us that de Barbin's childhood ended abruptly at age eleven when she was coerced by her grandmother into marrying a forty-five-year-old man, Mr. Richard "Dixie" W.D. Ware (Ware). Apparently, de Barbin's grandmother and another woman—"Aunt" Victoria—arranged the marriage with Ware, in exchange for "payment," after Ware heard de Barbin sing at a party. In the book, de Barbin briefly describes the singing party as follows:

"When I got home, there was a party going on. The house was full of strangers, mostly men. A well-dressed woman introduced herself and told me to call her Aunt Victoria. After dinner I was asked to sing. That was routine at our parties and I loved performing. I had recently learned the song 'Mother Machree' and dedicated it to my mother. I could see the tears in her eyes as I sang."

Several weeks thereafter, de Barbin was taken from Louisiana to Mississippi by her grandmother and "Aunt" Victoria.[1] As

1. The book, with de Barbin writing in the first person, describes these events following the singing party:

"She [de Barbin's mother] told me later that the strangers were friends of my grandmother and had come to visit because of me. They were interested in helping me study music. They would furnish us with a nice home and things wouldn't be as hard anymore. My mother could give up her terrible job. I was thrilled! I was only eleven and already my singing had helped.

"A few days later, my mother went off to live in a wonderful new home in Monroe, Louisiana. I was put in the care of Aunt Victoria. She was about forty and tall, with short, curly black hair. She was obviously wealthy because she had a closet full of fur coats and adorned herself with diamond rings, earrings, and necklaces. She began dressing me in her image. I loved the new clothes and acted out fantasies in the mirror, playing the part of a sophisticated lady out on the town. My hair was long and black like my mother's, and I experimented with different styles.

"Aunt Victoria caught me primping one day and said, 'Lucy, you're a very pretty girl and your breasts are very large. You look older than you really are. Some young man might

be interested in you. Don't tell anyone how young you really are.'

"I didn't like that. I was self-conscious about my breasts. I wanted to look like my friends. Their bosoms were flatter, and they could wear smock dresses. I was always trying to hide my figure under baggy clothes.

"Two weeks later Aunt Victoria said that my grandmother was coming to discuss my future. She arrived promptly and ordered me to cooperate with the family's wishes. She said a green-eyed girl like me would go wayward if she didn't get married. I couldn't believe what she was saying. Married? I was just eleven. I had never even had a boyfriend.

" 'I don't know anyone to get married to,' I said. 'I don't want to get married. I have to study.'

"She told me I didn't have to worry about finding a husband. It was all arranged. There was a nice man who thought I was pretty and had agreed to marry me. I would be taken to him in Jackson, Mississippi.

" 'No. I will not do this,' I said. 'My mother will never agree to this.'

"My grandmother told me that if I didn't do as I was told, my mother would be thrown out of the new home and forced to work as a

noted in the below-quoted passage, upon arrival in Mississippi, de Barbin was "prepared" for the wedding by Ware's sister and another woman. Mitchell alleges that she was Ware's sole living sister at the time of the marriage. The book's *only* references to her are contained in the following few passages in chapter one:

"I was taken to a wide, gray house with tall ceilings and dusty rugs. The *man's sister came to stay with me and prepare me for the wedding.* She looked like the house, drab and gray. *She kept asking, 'What's wrong with you?' because I was pale and frightened.* I was so afraid that I kept throwing up in the bathroom.

"A second woman, equally unpleasant, came and handed me a dismal skirt, blouse, and jacket to wear as my wedding gown. I was told that the man didn't want anything special so as not to attract attention. I knew it was because of my age. The women left me alone to dress.

"I stared in the mirror, trying to understand why all this was happening. I kept telling myself that God has a reason for everything. I thought of running away, but where could I go? I was in a strange city, and even if I did escape they would force my mother to go back to work. I tried to stay strong. I brushed away the tears so no one would see them.

"*I was taken outside and put in a car between the man and his sister.* No one said anything. I remember it was raining and dreary. I was brought before a man dressed in black, a justice of the peace. He mumbled some words without smiling and then ordered me to say 'I do.' I did as I was told. With a strange man behind me, and two strangers standing beside me, I was married. *We were driven back to the house. The women left.* I was alone with the man." (Emphasis added).[2]

The remainder of chapter one as authored by de Barbin describes Ware's abuse of de Barbin on their wedding night.

In the subsequent portion of chapter one written by Matera, the following commentary is made on these events:

"To this day, Lucy doesn't realize, or has refused to accept, the fact that she was *sold like a slave* to the highest bidder. The party at her house was actually a discreet *auction* with Lucy as the prized property. 'Aunt' Victoria was probably the wife of the local marriage broker, or possibly a marriage broker herself. Lucy's singing performance was geared toward titillating the buyers and opening their wallets. (Emphasis added).

"The winner of this auction was Richard 'Dixie' W.D. Ware [a footnote here explains this is not the Richard Ware of Monroe], an underachiever whose stake came from a family aviation business and some minor real estate transactions. The house in Monroe that Ware offered Lucy's family may have been only part of the price he paid for a beautiful eleven-year-old 'thoroughbred.'

"To some, this account may read as though it took place in another century. Actually, such marriages were not uncommon in 1947. The French have a tradition of arranged marriages and refer to them as *mariages de convenance.*

". . . .

"It is also significant that Lucy was brought to Mississippi to be married. In 1947, the minimum legal age a girl could

---

maid again. 'Do you want to see your mother work herself to death?' she admonished.

"I was then instructed to tell my mother that getting married was my idea and I would be happy. A week passed. I thought it had all been a horrible dream. Then Aunt Victoria and my grandmother came and told me to pack my things. They put me in a big black car and drove me to Mississippi. I was introduced to a man I remembered having seen at my house when I sang. He was tall, about six feet, thin, and had a ruddy complexion and dark reddish hair streaked with gray. He was at least forty-five or older and smelled of alcohol.

"He was to be my husband. I had never been kissed and now I was to be the wife of a forty-five-year-old man."

**2.** These passages immediately follow those set out in note 1, *supra.*

marry with parental consent in Louisiana was sixteen. In Mississippi, the minimum age was twelve."

A dramatic summary of de Barbin's plight appears on the book's jacket, which states that "Elvis inspired [de Barbin] to shake off the chains of despair and hopelessness and free herself from a brutal husband foisted upon her at age eleven by an old-world immigrant family."

Mitchell brought this suit alleging that the passages concerning her falsely portrayed her as a participant in a coerced marriage of an underage girl and that such a false portrayal damaged her reputation. In addition to her defamation claim, Mitchell asserted claims of "false light" invasion of privacy and intentional and negligent infliction of emotional distress. The district court dismissed Mitchell's suit for failure to state a claim after concluding as a matter of Mississippi law that, *inter alia*, the relevant passages were not susceptible to the defamatory meaning ascribed to them by Mitchell.

## Discussion

■ The parties and the district court, in its thorough and well considered memorandum opinion, have treated this case as governed by Mississippi substantive law. In this connection, we accord appropriate deference to the district court's interpretation of the law of the state in which it sits. *See, e.g., Armstrong v. Farm Equipment Co.,* 742 F.2d 883, 886 (5th Cir.1984); *Acree v. Shell Oil Company,* 721 F.2d 524 (5th Cir.1983); *Smith v. Mobil Corp.,* 719 F.2d 1313, 1317 (5th Cir.1983).

### I. *Defamation*

In order to prevail on her defamation claim under Mississippi law, Mitchell must establish:

"(1) a false and defamatory statement concerning another;

"(2) an unprivileged publication to a third party;

"(3) fault amounting at least to negligence on the part of the publisher;

"and

"(4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Fulton v. Mississippi Publishers Corp.,* 498 So.2d 1215, 1216 (Miss. 1986) (quoting *Restatement (Second) of Torts* § 558 (1977)).

### A. *Falsity*

■ The threshold question for a court to consider is whether the statements made are false, as truth is a complete defense to libel. *Blake v. Gannett Co.,* 529 So.2d 595, 602 (Miss.1988). The complaint expressly admits that "Plaintiff witnessed the marriage of defendant Lucy De Barbin to her brother Richard 'Dixie' W.D. Ware, such marriage being with the apparent full consent of both parties," but alleges that the book is false in that "Plaintiff did not ever participate in or co-operate with any 'slave auction' purchase, enticement, harboring, transportation or marriage of an unwilling eleven year old child to plaintiff's brother, Richard 'Dixie' W.D. Ware."[3]

■ On appeal the parties clearly dispute de Barbin's age at the time of the marriage.[4] Undoubtedly, much of the

---

**3.** The only other two falsities with which the complaint charges the book are that the marriage "took place in Louisiana, not in Mississippi" and that "Plaintiff did not ever participate in or co-operate with any maltreatment, abuse or brutality directed toward defendant Lucy De Barbin by Richard 'Dixie' W.D. Ware. Mr. Ware did not conduct himself in such fashion toward his wife, defendant Lucy De Barbin."

As to the first allegation, for the reasons given by the district court, we find nothing defamatory in respect to the claimed falsity. As to the second allegation, as the district court pointed out, the book does not charge plaintiff with

participating or cooperating in any maltreatment, abuse or brutality by Ware, none which is indicated by the book to have occurred prior to plaintiff's departure from the scene (and from the book) following the marriage ceremony. Hence we concentrate on the allegations quoted in the text.

**4.** As its language quoted above in the text reflects, Mitchell's complaint did not clearly allege *what* elements of the book's marriage description were false. On appeal she expressly states that at the time de Barbin "was not underage" and that "the marriage was uncoerced."

reader's moral outrage at de Barbin's marriage stems from the fact that de Barbin was purportedly only eleven at the time of the marriage.[5] The record contains nothing else reflecting de Barbin's actual age at the marriage. While such a fact is normally quite easily proved, we do not find that information critical to our decision. Even assuming an older de Barbin than the one portrayed, we feel compelled by Mississippi law to affirm the district court's judgment that such a false depiction does not defame Mitchell.

## B. Defamatory

██ The trial court's function is to determine whether the statements bear the meaning ascribed to them by the plaintiff and whether that meaning is defamatory. *Fulton*, 498 So.2d at 1217; *Brewer v. Memphis Publishing Co.*, 626 F.2d 1238, 1245 (5th Cir.1980). If the court decides against the plaintiff on either of these issues, then the case does not proceed to the jury. *Fulton*, 498 So.2d at 1216 (citing *Restatement (Second) of Torts* § 614 (1977)). However, if the trial court decides that the language is "ambiguous, of doubtful import, or susceptible to two or more interpretations, its actionability must ordinarily be decided by the jury under appropriate instructions from the court." *Brewer*, 626 F.2d at 1245,

citing *Cameron Bros. v. Posey*, 237 Miss. 432, 115 So.2d 138 (1959).

Mississippi recognizes the common law rule of defamation that

"any written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community is actionable per se." *Ferguson v. Watkins*, 448 So.2d 271, 275 (Miss.1984).

*Fulton*, 498 So.2d at 1217; *Chatham v. Gulf Publishing Co.*, 502 So.2d 647, 650 (Miss.1987). In *Ferguson*, the Mississippi Supreme Court refined the common law rule to require that (1) "the words employed must have clearly been directed toward the plaintiff," *and* (2) "the defamation must be clear and unmistakable from the words themselves and not be the product of innuendo, speculation or conjecture." *Ferguson*, 448 So.2d at 275; *Fulton*, 498 So.2d at 1217; *Chatham*, 502 So. 2d at 650. *Ferguson* also states that the above quoted "[t]wo restrictions upon the action for defamation ... must be *strictly* enforced." 448 So.2d at 275 (emphasis added). *Fulton* recites that "[i]n *Ferguson* we refined the common law rule to require that" [quoting the above two requirements as stated in *Ferguson* ]. 498 So.2d at 1217. This language from *Fulton*, and its quota-

---

5. While our modern-day sensibilities are justifiably shocked at the idea of a marriage between an eleven-year-old girl and a forty-five-year-old man, it is important to remember that the common law age of marriage in Mississippi at the time of de Barbin's marriage in 1947 was twelve for a female (as the book itself reflects). *Hunt v. Hunt,* 172 Miss. 732, 161 So. 119, 122 (1935).

See 52 Am.Jur.2d *Marriage* § 14 ("... the general rule in American jurisdictions before the enactment of statutes covering the subject, was that males had capacity to contract marriage at the age of 14 years and females at 12 years" (footnote omitted), and "the common-law rule [was] that a marriage of one under age 7 is absolutely void and a nullity, and that the marriage of one over the age of 7, but under the age of consent—14 for a male and 12 for a female— is voidable" (footnote omitted)); § 15 ("... while, in the absence of a statute making it void, the marriage of a minor under the age of consent is voidable, the marriage of one between the age of consent and the age under which parental consent is required, without obtaining

such consent, is valid ..." (footnote omitted)); § 86 ("In the absence of a statute providing otherwise, the general rule is that an intent to evade local marriage law by going to another state to contract a marriage that could not lawfully be entered into in the home state has no effect on the validity of the marriage." (footnote omitted)); § 87 (marriage evasion statutes enacted by several states "provide basically that a marriage by domiciliaries of one state, which takes place in another state and is valid by the law of that state, will nevertheless not be recognized as valid in their home state if the parties contracted the marriage in the other state in order to evade the law of their home state, under which their marriage would be void, and then returned to their home state to live as husband and wife" (footnote omitted)). *See also* 55 C.J.S. *Marriage* § 11 (common law age of consent to marry for female is 12; marriage of female over 7 but under 12 "was not absolutely void, but was a voidable, or an imperfect, or inchoate marriage" (footnote omitted)).

tion of the two *Ferguson* requirements, is set out with approval in *Chatham.* 502 So.2d at 650. The above set out language from *Ferguson* was likewise quoted with approval in *Blake v. Gannett Co., Inc.,* 529 So.2d 595, 603 (Miss.1988).

The thus recently "refined" common law rule has been stringently applied by the Mississippi Supreme Court in subsequent defamation cases. *See, e.g., Chatham,* 502 So.2d at 650. Diversity jurisdiction requires us to apply Mississippi law as we believe the highest court of Mississippi would do, regardless of our independent opinion of the state's standard or its application. *Brewer,* 626 F.2d at 1241–42. Accordingly, we evaluate Mitchell's claim under the *Ferguson* standard.[6]

Chapter one of the book colors de Barbin's marriage with coercion and abuse. It is clear that the passages concerning Mitchell make her a participant in de Barbin's marriage. What is not "clear and unmistakable" from the passages concerning Mitchell, whether read alone or in context, is Mitchell's involvement in or knowledge of the coercive or abusive aspects of the marriage so as to *defame her* in the community's eyes. Mitchell "prepared" de Barbin for the wedding and attended the ceremony. Mitchell asked de Barbin "What was wrong with [her]?" but de Barbin never told Mitchell what was wrong and, in fact, the book reports that de Barbin went out of her way to hide her misery from Mitchell. It is only by innuendo, speculation, or conjecture that we can conclude from the book that Mitchell was aware of or played any part in the coercive arrangement of the marriage, or knew de Barbin's age, and the book expressly excludes Mitchell from involvement in Ware's alleged abuse of de Barbin following the marriage ceremony.

Viewed objectively, the "bad" characters in chapter one are de Barbin's grandmother, Ware, and possibly "Aunt" Victoria. The words concerning these persons clearly and unmistakably portray them as manipulative and abusive of de Barbin. The only aspects of Mitchell's character that are clear and unmistakable from the relevant passages are that de Barbin viewed Mitchell as "unpleasant" and "drab and grey." One is not defamed by mere opinion. *Ferguson,* 448 So.2d at 276. Perhaps it can reasonably be inferred that Mitchell was somewhat insensitive, unsympathetic, or callous, but such does not suffice for defamation under Mississippi law, and it cannot be said that the book clearly and unmistakably goes beyond that to portray Mitchell's involvement as being with knowledge of de Barbin's age or the coercive or abusive aspects of the marriage. Mitchell is an unnamed character with an incidental role in de Barbin's marriage and an altogether trivial role in the book as a whole. The allegedly false portayal of a coerced marriage of an underage child does not automatically defame anyone who was involved, however tangentially, with that marriage, regardless of whether we think the false portrayal as a whole is offensive. In other words, Mitchell is unfortunately and rather callously interjected as a willing participant in de Barbin's less than joyful union; however, the passages that discuss Mitchell's involvement do not "clearly and unmistakably" implicate her in the *coercive* and *abusive* aspects of that union. The Mississippi Supreme Court has found language that is more clearly false and damaging, vis-a-vis the plaintiff, to be nondefamatory. *See, e.g., Chatham,* 502 So.2d at 648–50 (article in a newspaper that falsely reported a fight at the plaintiff's lounge did not defame plaintiff's business reputation by implying that plaintiff's lounge was unsafe); *Baugh v. Baugh,* 512 So.2d 1283, 1285 (Miss.1987); *Fulton,* 498 So.2d at 1217.

Mitchell also asserts that her mere participation in the marriage defames her because such participation was a crime un-

---

**6.** We note that *Ferguson* was decided several years after our decision in *Brewer,* and accordingly any tension between the two as to substantive Mississippi law—particularly as respects *Ferguson's* injunction to "strictly" enforce the requirement that "the defamation must be clear and unmistakable from the words themselves and not be the product of innuendo, speculation or conjecture"—must be resolved in favor of *Ferguson.*

der Mississippi law. Mississippi Code § 97–5–5 provides that:

> "Every person who shall maliciously, wilfully, or fraudulently lead, take, carry away, decoy or entice away, any child under the age of fourteen years, with intent to detain or conceal such child from its parents, guardian, or other person having lawful charge of such child, or for the purpose of prostitution, concubinage, or marriage, shall, on conviction, be imprisoned in the penitentiary not exceeding ten years, or imprisoned in the county jail not more than one year, or fined not more than one thousand dollars, or both."

The district court rejected Mitchell's contentions in this regard, holding that the book's account did not state a violation of section 97–5–5 on Mitchell's part. We defer to this determination of Mississippi law. We are cited to no case suggesting the application of that statute to an innocent *witness* at a marriage. The book does not state—or clearly and unmistakably imply— that Mitchell knew de Barbin was not of lawful age to marry with parental consent or that parental consent was lacking. To the contrary, it is clearly implied that de Barbin looked significantly older than eleven and that her mother consented to the marriage and lived in the house acquired as a result of the arrangement for it. Mitchell relies on *Riley v. State*, 18 So. 117, 118 (Miss.1895) for the proposition that knowledge of the child's age is not an element of the section 97–5–5 offense. However, in *Riley* the lack of knowledge asserted was that of the principal—the man who carried the girl off. Moreover, the charge there required the jury to find that defendant

carried the girl away "maliciously, willfully, or fraudulently ... *without the consent of her mother." Id.* at 117 (emphasis added).

This "crime," like the "coercive" elements of de Barbin's wedding, is not directed at Mitchell. Mitchell is a minor character without whom the story of coercion would still be complete. The words that are of and concerning Mitchell do not clearly and unmistakably defame her. It is only through innuendo, speculation, and conjecture that the reader might find Mitchell aware of and agreeable to the abuses of de Barbin's grandmother and Ware, or aware of de Barbin's age. Moreover, it is undisputed that Mitchell cannot rescue the reputation of her deceased brother from the book's potentially false allegations. See *Wilson v. Retail Credit Company*, 325 F.Supp. 460, 463 (S.D.Miss.1971), *aff'd* 457 F.2d 1406 (5th Cir.1972).

## II. *False Light*

■ Mitchell also claims that her privacy was invaded because she was placed in a false light before the public.[7] Although Mitchell's situation might present a colorable "false light" claim under the *Restatement* requirements for that tort, the Mississippi Supreme Court has not explicitly recognized the "false light" cause of action. *See Prescott v. Bay St. Louis Newspapers, Inc.*, 497 So.2d 77, 79 (Miss.1986). In *Prescott*, the Mississippi Supreme Court stated that "[a]part from acknowledging false light as one recognized theory of recovery, however, we have not confronted the question of whether *we* will recognize this theory." *Id.*

---

7. Section 652E of the *Restatement (Second) of Torts* (1976) states the requirements for recovery under false light as follows:

"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

"(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

"(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

The false light action is allegedly aimed at statements that cast the plaintiff in a false position, where such statements do not amount to defamation. *See Prosser & Keeton on The Law of Torts* 866 (W. Page Keeton 5th ed. 1984); *Prescott*, 497 So.2d at 80.

The Tenth Circuit, in *Rinsley v. Brandt*, 700 F.2d 1304, 1307 (1983), noted that false light actions differ from defamation actions in that recovery under "false light" is for mental distress as opposed to injury to reputation.

However, as we have often declared concerning state law in diversity cases, "it is not for us to adopt innovative theories of recovery or defense for ... [in this case, Mississippi] law, but simply to apply that law as it currently exists." *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1217 (5th Cir.1985) (footnote omitted). *See also Barrera v. E.I. DuPont De Nemours & Co., Inc.*, 653 F.2d. 915, 920 (5th Cir. 1981); *Rhynes v. Branick Manufacturing Corp.*, 629 F.2d 409, 410 (5th Cir.1980). Mississippi has never expressly or impliedly adopted the "false light" tort or allowed recovery in a case of this kind on other than a defamation theory. We accordingly decline to adopt for Mississippi Mitchell's false light theory. Moreover, it appears rather doubtful to us that Mississippi, having quite recently "refined" its law so as, in substance, to restrict libel recovery for false noncommercial writings concerning the plaintiff by mandating "strict" enforcement of a requirement that the *"defamation* be clear and unmistakable from the words themselves and not the product of innuendo," would now in effect significantly undercut that refinement by allowing almost identical tort recovery, but with a substantially diluted standard of defamation, merely because a different name has been attached to the claim. Surely it is the substance of what the law does, not the labels given, that is important.

III. *Emotional Distress*

█ Mitchell also alleges claims for intentional and negligent infliction of emotional distress. To recover for intentional infliction of emotional distress, the defendants' conduct must evoke "outrage or revulsion." *See Sears, Roebuck & Co. v. Devers*, 405 So.2d 898, 902 (Miss.1981); *see also Burris v. South Central Bell Telephone Co.*, 540 F.Supp. 905, 909 (S.D.Miss. 1982) (conduct should be "extreme and outrageous") (quoting *Restatement (Second) of Torts* § 46 comment (d)). While de Barbin's portrayal of Mitchell may be decidedly unfair, it simply does not rise to the level of repulsion.

█ There is no Mississippi precedent to support Mitchell's claim for negligent infliction of emotional distress based upon a written noncommercial publication. We will not create this tort for Mississippi. The only decisions that have held that a written publication could form the basis for an action based on negligence involve instances of commercial speech, which is not entitled to the same degree of protection under the First Amendment as de Barbin's book. *See Eimann v. Soldier of Fortune Magazine, Inc.*, 680 F.Supp. 863, 865 (S.D. Tex.1988). Because Mitchell offers no support for her negligence claim, and we find none for it under Mississippi law, we affirm its dismissal.[8]

**8.** We also reject Mitchell's appellate complaint that the dismissal should have been without prejudice, so that she could file an amended pleading. When the district court rendered its memorandum opinion on appellees' motion to dismiss for failure to state a claim, that motion (and one to dismiss for want of personal jurisdiction, the district court's denial of which is not complained of on appeal) had been pending for more than seven months. Mitchell, who has been represented by counsel throughout, was never denied any discovery or extension of time she sought. Mitchell's response to appellees' motions did not disclose any additional facts, except for an affidavit that suggested—as a rejoinder to appellees' pending motion to dismiss for want of personal jurisdiction—that she sustained damages in Mississippi and that if necessary this could be alleged in an amended pleading. At the end of a lengthy memorandum of authority submitted by Mitchell in support of her response—but not filed with the clerk below or included in the record—Mitchell stated "[t]o the extent that the Court might accept any of Defendant's arguments that the Complaint herein fails to state a claim on which relief may be granted, Plaintiff respectfully requests leave of Court to amend such Complaint, pursuant to F.R.Civ.P.Rule 15(a)." However, nothing in that memorandum, or in the record, gives any suggestion as to what would be alleged by amendment, nor does the memorandum assert any new facts (nor has Mitchell on appeal, except to say, as she inferentially did below, that the wedding "was not coerced" and de Barbin was then "well over the age of marriage"). Moreover, Mitchell never tendered any amendment or amended complaint or otherwise moved to amend, as she could have done even after judgment, *Griggs v. Hinds*, 563 F.2d 179 (5th Cir.1977); *Quartana v. Utterback*, 789 F.2d 1297, 1300 (5th Cir.1986), and the district court never refused or denied—or stated that it would refuse or deny—any tendered amendment or

## Conclusion

Regrettably, the treatment of Mitchell in de Barbin's book may be unfair; but under the Mississippi defamation standard it is not defamatory. Mitchell's alternative claims are either not yet cognizable under Mississippi law or are without merit; therefore, we affirm the judgment of the district court.

AFFIRMED.

amended complaint or motion for leave to amend. In these circumstances, Mitchell's argument in this regard presents no reversible error. *Manax v. McNamara,* 842 F.2d 808, 813–14 (5th Cir.1988).