# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CA-00447-SCT

*JOURNAL PUBLISHING COMPANY AND SID SCOTT*

*v.*

*DERWOOD McCULLOUGH*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/28/97 |
| TRIAL JUDGE: | HON. HARVEY S. BUCK |
| COURT FROM WHICH APPEALED: | CHICKASAW COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | THOMAS WICKER |
| ATTORNEYS FOR APPELLEE: | GRADY F. TOLLISON, JR. |
| | KENNETH M. BURNS |
| | KENNA L. MANSFIELD, JR. |
| | E. FARISH PERCY |
| NATURE OF THE CASE: | CIVIL - TORTS (OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE) |
| DISPOSITION: | REVERSED AND RENDERED - 8/5/1999 |
| MOTION FOR REHEARING FILED: | 08/19/99; denied 10/07/99 |
| MANDATE ISSUED: | 10/14/99 |

**BEFORE SULLIVAN, P.J., BANKS AND WALLER, JJ.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. This is a libel case in which a jury awarded actual and punitive damages to a former chancery clerk where the newspaper printed a story revealing that a truck seized in a drug arrest was registered to him. We

conclude that, under the applicable standards for libel involving a public official as dictated by the First Amendment to the Constitution of the United States, the plaintiff failed to adduce sufficient evidence to allow a reasonable jury to conclude that the reporter and newspaper entertained substantial doubt as to the veracity of the story. Accordingly, we reverse the judgment of the circuit court and render judgment for defendants.

## I.

¶2. This is a case in which the plaintiff, Derwood McCullough, alleged that the defendants, Journal Publishing Company (Journal) and Sid Scott, libeled him in articles published on July 16 and 17, 1991.[1] At the time of publication, McCullough was the Chancery Clerk of Chickasaw County, and Sid Scott was an employee of Journal Publishing Company and a reporter for the newspaper published by Journal, the *Northeast Mississippi Daily Journal* (*Daily Journal*).

¶3. The newspaper articles in question concerned a Chickasaw County drug bust which took place on the morning of Monday, July 15, 1991. Officers arrested five people in connection with this bust, including Earl Gladney and his wife Gail. Four vehicles were seized by law enforcement officials, including a 1978 Ford pickup truck which, it turns out, had been purchased by Earl Gladney from McCullough on June 24, 1991.

¶4. Gladney had signed an Application for Certificate of Title on that day. According to McCullough, the truck had been sitting on his property with expired tags and had not been used on the road. He knew Gladney, and had let him take the truck in April or May with the understanding that Gladney would buy it if he could fix it. McCullough never removed the expired tags from the vehicle. In June, Gladney had called McCullough to let him know that he wanted to purchase the truck, and McCullough co-signed the bank note for Gladney for part of the funds to buy the truck.

¶5. Sheriff Martin "Mack" Cook brought Gladney and his wife into town after the arrest on the morning of July 15. Gail Gladney told Sheriff Cook that the truck belonged to her husband, Earl. Earl Gladney also stated in an affidavit that he told Cook that he had purchased the truck from McCullough in June. Cook testified, however, that he was doubtful of this claim and ran the tag number through the National Crime Information Center (NCIC) computer terminal.[2] This check revealed that the truck was registered to McCullough. Due apparently to the delay in the time it takes for a new title to be issued after an application for title is made, the NCIC records also showed that the vehicle was still titled in McCullough's name. [3]

¶6. McCullough learned of the drug bust sometime after lunch on July 15 and was told by a friend that there was talk that a truck of his was picked up in a drug bust and that "you're fixing to make the news again." After calling his lawyer, McCullough went to the office of Dale Mooneyham, the tax assessor. Mooneyham accessed the same State Tax Commission database as the NCIC computer and produced for McCullough a computer record of a title *application* signed by Gladney on June 24. This document indicates that the truck was owned by Earl Gladney and that he purchased it on June 24, 1991.

¶7. McCullough called Sheriff Cook between 3:00 and 4:00 p.m. and told Cook that he had sold the truck on June 24. He told Cook that he had gotten verification of the purchase from Mooneyham's office and that Cook could do the same if he wanted to. McCullough was angry and demanded that Cook straighten out any incorrect information concerning the ownership of the truck with the media. Specifically, McCullough told Cook to call any news media to whom Cook had given information and to inform them that the truck no longer belonged to McCullough.

¶8. Several local reporters, including Kenny Hoblitzell from the *Times Post* of Houston, Mississippi, had heard of the drug bust soon after it happened. Hoblitzell was at the sheriff's office when Gladney and his wife were brought in at approximately 8:00 a.m. Cook had apparently told some of these media persons that the truck was titled to McCullough. Other reporters, however, contacted the sheriff's office at later times throughout the day. As the day progressed, the sheriff's office became busier and at some point Cook began to give only the tag numbers of the confiscated vehicles, allowing the reporters to investigate the question of ownership for themselves. ***McCullough v. Cook,*** 679 So. 2d at 629. After Cook received the call from McCullough demanding that he correct the misinformation concerning ownership of the truck, Cook called back only Hoblitzell and a few others to whom he had given McCullough's name.

¶9. Sid Scott, a reporter for the *Daily Journal,* heard about the drug bust and had called the sheriff's office for details some time between 10:00 and 11:30 a.m.[4] He spoke to Sheriff Cook for ten to twenty minutes, but Cook would not give him the names of the owners of the vehicles. Cook did, however, furnish Scott with the tag numbers of the seized vehicles.[5] Scott took these tag numbers to another law enforcement agency and had them checked against the records of the State Tax Commission on the NCIC terminal, which revealed that the Ford pickup was registered and titled in McCullough's name. Since Scott had been given only the tag numbers, Scott was not among those who were called back by Sheriff Cook with the information that McCullough's ownership of the truck was disputed.

¶10. Scott testified that he tried to call both offices of the chancery clerk that afternoon between 4:00 and 5:00 p.m. for general comments from McCullough, but that he could not get an answer from McCullough, who introduced testimony at trial from one of his employees that she was at the Houston office all afternoon on July 15. She testified that the phones never go unanswered in either office and that no call from Scott was received on that day. McCullough admitted that he did not attempt to call Scott or the *Daily Journal* on July 15.

¶11. The article written by Scott which appeared in the *Daily Journal* the next day, July 16, 1991, was headlined "Five arrested in Chickasaw County drug bust" and had a tag line above the headline which read "Chancery clerk's truck seized." The body of the story began:

> HOUSTON -- A three-month-long drug investigation in Chickasaw County led to the arrest of five people Monday morning, and the confiscation of a truck owned by Chancery Clerk Derwood McCullough. . . .

After naming those arrested and the crimes with which they were charged, the article continued:

> Four vehicles were confiscated during the raid, Cook said.
>
> One of them, a Ford pickup, is registered to McCullough, Chickasaw County Chancery Clerk, according to records at the state Tax Commission.
>
> The truck registered to McCullough was confiscated from Gladney's mobile home in Van Vleet,

Cook said.

McCullough couldn't be reached for comment Monday to explain why his truck was at the scene of the drug bust.

McCullough and Gladney, also known as E.G. Harris, have been linked before on suspected criminal charges.

In September they were indicted on criminal fraud charges in federal court in Oxford.

The federal grand jury accused them of using a loan company they co-owned to finance Chickasaw County's purchase of a front-end loader in July 1988. The indictment charged that the financing was in violation of state conflict of interest laws.

The charges against them were dismissed by U.S. district judge Neal Biggers in February.

The article also featured a "pull quote" in large bold type in the second column of the article, which repeated:

Four vehicles were confiscated during the raid, Sheriff Mack Cook said. One of them, a Ford pickup, is registered to McCullough, Chickasaw County Chancery Clerk, according to records at the state Tax Commission.

¶12. At some point after this article appeared, Scott heard from the Associated Press that there might be something wrong with his story and that he should check it out. Scott called McCullough at his office on July 16 and asked him whether the truck belonged to him. McCullough told him that it did not, and the two men had a "spirited" conversation. In the meantime, the State Tax Commission records accessed through the NCIC had been changed to reflect that the vehicle was titled in Gladney's name.[6]

¶13. On the following day, Wednesday, July 17, Scott published another article in the *Daily Journal.* This article was headlined "Clerk: Truck sold before drug bust," and stated:

HOUSTON -- A pickup truck found at the scene of a drug bust Monday is registered in Chickasaw County Chancery Clerk Derwood McCullough's name, though the title shows it no longer belongs to him.

McCullough said Tuesday he sold the truck to Earl Gladney of Van Vleet on June 24. Gladney is one of the five people arrested Monday.

Records in the tax assessor's office show the title was transferred Monday, the day of the drug bust, when the 1978 pickup was confiscated.

McCullough said the fact that the title was transferred to Gladney on the day he was arrested is

coincidental. It took from June 24 to Monday for the state Tax Commission to record the title in its computer system, he said.

Tax assessor Dale Mooneyham said it's possible for a title transfer to take that long.

"Sometimes it takes three to four weeks," Mooneyham said. "It's according to the work load they (state Tax Commission officials) have."

This article, like the one published the previous day, again listed those arrested and then repeated the statement concerning McCullough's and Gladney's previous indictment in federal court:

McCullough and Gladney, also known as E.G. Harris, have been linked before on suspected criminal charges. They were indicted in September on fraud charges in federal court in Oxford. The charges were dismissed in February by U.S. District Judge Neal Biggers.

The charges involved a finance company, M & H Loans, that was co-owned by the two. The company was used to finance the county's purchase of a front-end loader in 1988.

¶14. McCullough had served as chancery clerk for Chickasaw County for thirty-six years, and 1991 was an election year. The qualification deadline for seeking election as chancery clerk was July 19, 1991, and at the time of the publication of the articles McCullough had not yet made up his mind whether to seek re-election. He testified that on the final day he decided not to seek re-election, but that "in all likelihood" he would have chosen to run but for the negative publicity created by Scott's articles.

¶15. On August 2, 1991, attorney Grady Tollison, on behalf of McCullough, wrote to the *Daily Journal* demanding a correction of the story of July 16, pursuant to Miss. Code Ann. § 95-1-5 (1994). The letter stated that the story's language referring to McCullough as the owner of the truck confiscated in alleged criminal activity was false and defamatory. The letter also stated that the story referred to McCullough's involvement in other criminal activity and demanded a retraction and apology. The letter did not mention the article of July 17.

¶16. Counsel for the defendants responded to this letter by pointing out that when the story was written ownership of the truck was titled in the name of McCullough and that in printing this information the *Daily Journal* was entitled to, and in fact did, rely on official state records. The defendants further claimed that the story had already been clarified by the article of July 17. As to the complaint about the report that McCullough and Gladney were linked in connection with suspected criminal charges, counsel for the defendants responded that "[i]nsofar as we have been able to determine, the information published was both accurate and true."

¶17. On October 11, 1991, McCullough filed his complaint against the defendants in the Circuit Court of Chickasaw County, claiming that the defendants had libeled him and were liable for actual and punitive damages. On April 28, 1992, Defendant Cook moved for summary judgment, which was granted by the trial court. On September 1, 1993, Defendants Journal Publishing and Sid Scott also moved for summary

judgment, which the trial court denied in an opinion entered on June 7, 1995.

¶18. After this Court reversed and remanded the trial court's grant of summary judgment for Defendant Cook, *McCullough v. Cook,* 679 So. 2d 627 (Miss. 1996), the case proceeded to trial on February 3, 1997. On February 7, 1997, the jury returned a verdict in favor of McCullough against Journal and Scott for $300,000.00 in actual damages. The jury also assessed punitive damages against Journal at $250, 000.00 and against Scott at $50,000.00. The jury found in favor of Defendant Cook. On March 3, 1997, the trial court entered a judgment reflecting the jury's verdict. On March 10, 1997, the defendants filed a Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for New Trial, which was denied by an order entered on April 2, 1997. On April 2, 1997, the defendants filed their Notice of Appeal.

## II.

¶19. Defendants assert a number of grounds for reversal. Because we find the issue of the sufficiency of the proof on liability dispositive, we need not discuss the other assertions of error.

### a.

¶20. In cases of this constitutional character, the Court employs a heightened standard of review. In determining the sufficiency of the evidence to pass constitutional muster, the appellate court must make an independent review of the evidence. "We must 'make an independent examination of the whole record,' . . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression."*Gulf Publ'g Co., v. Lee,* 434 So. 2d 687, 696 (Miss. 1983) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 285 (1964)). *See also Time, Inc. v. Pape,* 401 U.S. 279, 284 (1971); *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler,* 398 U.S. 6, 11 (1970); *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 82 (1967); *Long v. Arcell,* 618 F.2d 1145, 1147 (5th Cir. 1980) ("our duty is to make an independent examination of the evidence and determine whether there was a clear and convincing showing of actual malice"); *Meridian Star, Inc. v. Williams*, 549 So. 2d 1332, 1335 (Miss. 1989), *overruled on other grounds, Roussel v. Robbins*, 688 So. 2d 714 (Miss. 1996).

¶21. Journal Publishing and Sid Scott argue that the trial court erred in not granting them summary judgment, not granting their motion for directed verdict and in submitting the issue for trial. They assert that the information published about McCullough in the articles in question was not false or defamatory. More importantly, they argue, however, that even if the plaintiff were able to present a jury issue concerning falsity and defamatory meaning, the case would still fail, since no evidence exists which would support a finding of "actual malice" as defined under the standard outlined by the United States Supreme Court in *New York Times,* 376 U.S. 254.

¶22. To establish a claim for defamation, an ordinary plaintiff must show the following: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Moon v. Condere Corp.,* 690 So. 2d 1191, 1195 (Miss. 1997); *Eselin-Bullock & Assocs. Ins. Agency, Inc. v. National Gen. Ins. Co.,* 604 So. 2d 236, 241 (Miss. 1992); *Blake v. Gannett Co*., 529 So. 2d 595, 602 (Miss. 1988); *Chatham v. Gulf Publ'g Co*., 502 So. 2d 647, 649 (Miss. 1987).

¶23. Where the defamed party is a public figure, however, that party is prohibited from recovering damages

unless they prove that the statement was made with actual malice--that is, with knowledge that it was false or with reckless disregard of whether it was false or not, while entertaining subjective doubt as the truth of the statement. *Stegall v. WTWV, Inc.,* 609 So. 2d 348, 352 (Miss. 1992); *Eselin-Bullock,* 604 So. 2d at 241; *Blake,* 529 So. 2d at 600-01; *See also Curtis Publ'g Co. v. Butts,* 388 U.S. 130, 164 (1967); *New York Times,* 376 U.S. 254. Further, the burden of proving actual malice is by clear and convincing evidence, not a preponderance of the evidence. *Stegall,* 609 So. 2d at 351-52; *Gulf Publ'g Co.,* 434 So. 2d at 696 (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974); *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 52 (1971); *New York Times*, 376 U.S. at 285-86)).

**b.**

¶24. The threshold question here is whether the statements made in the subject articles are defamatory. *Meridian Star,* 549 So. 2d at 1334; *Fulton v. Mississippi Publishers Corp.,* 498 So. 2d 1215, 1216 (Miss. 1986); *Ferguson v. Watkins,* 448 So. 2d 271, 275 (Miss.1984). *But see Blake,* 529 So. 2d at 602-03. This Court has described a defamatory statement as "'[a]ny written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community.'" *Fulton,* 498 So. 2d at 1217 (quoting *Ferguson,* 448 So. 2d at 275)). *See also Whitten v. Commercial Dispatch Publ'g Co.,* 487 So. 2d 843, 845 (Miss. 1986); *Gulf Publ'g,* 434 So. 2d at 695. The words employed must have clearly been directed toward the plaintiff, and the defamation must be clear and unmistakable from the words themselves and not be the product of innuendo, speculation or conjecture. *Ferguson,* 448 So. 2d at 275. Moreover, the headline or portions of the story may not be isolated, but must be considered together and construed as a whole. *Blake,* 529 So. 2d at 604-06.

¶25. There is little doubt that the part of Scott's article which emphasized that McCullough owned the seized truck raised a jury question of whether the words had a defamatory effect upon McCullough's reputation. The statement that McCullough's truck was seized in a drug bust was directed at him, and arguably associates him with illegal drug activity. Scott and his editor both admitted that a story associating a public official with a drug bust would be fatal to his political career. Thus, a reasonable jury could determine that the statements in the headline and body of Scott's article of July 16, 1991, indicating that McCullough owned the truck seized in the drug bust were defamatory.

¶26. The defendants maintain, however, that the statements contained in the article are substantially true. Truth is an absolute defense to a defamation lawsuit in Mississippi. *See, e.g., Eason v. Federal Broad. Co.,* 697 So. 2d 435, 437 (Miss. 1997). The defendants downplay the fact that McCullough did not own the truck and that the statement regarding ownership was thus false; they point out that even if Scott had found out that the title was no longer in McCullough's name, the registration still was. Thus, the defendants argue that "the story truthfully reported that a truck registered to McCullough (and, as pointed out in the July 17th article, one which had only recently belonged to him) had been provided by the Plaintiff to Gladney)."

¶27. Even if the technical falsity of the statement regarding ownership could be discounted as the defendants suggest, this Court in the related case of *McCullough v. Cook* recognized that an underlying implication drawn from facially true statements may be sufficient to render the statements false. *McCullough v. Cook*, 679 So. 2d at 632. While that inquiry concerned the underlying implication created by the *omission* of crucial information which Sheriff Cook could have given to Scott--namely, that there was some conflict

about the truck's ownership--it is also true that the overall tone or structure of a story may so distort the truth as to make the underlying implication of the story false, even where no material omissions are involved. *See id. See also **Eselin-Bullock,*** 604 So. 2d at 241 (question of what is or is not implied by allegedly defamatory statements is a question of fact for jury).

¶28. In ***Church of Scientology v. Flynn,*** 744 F.2d 694 (9th Cir. 1984), an attorney who represented former Church of Scientology members made a speech in which he implied, but did not say, that the Church tried to sabotage his plane. *Id.* at 695. The district court dismissed the Church's defamation suit for failure to state a claim for which relief could be granted. In reversing that dismissal, the court of appeals stated:

> Although Flynn did not specifically accuse CSC of attempting to cause his death, it would be reasonable to imply a defamatory meaning from his remarks. It is well settled that the "arrangement and phrasing of apparently nonlibelous statements" cannot hide the existence of a defamatory meaning. ***Kapellas v. Kofman,*** 459 P.2d 912, 919-20 (Cal. 1969). Indeed, the meaning of a statement is often dependent upon its context. *See **Mullins v. Brando,*** 91 Cal.Rptr. 796, 798-99 (Cal. App. 1970). It would be entirely reasonable for a jury to conclude that Flynn was accusing CSC of attempting to cause his death, rather than merely describing something that had happened to him. *See id.*; *see also **Okun v. Superior Court,*** 629 P.2d 1369, 1373 (Cal. 1981) ("[A] writing's susceptibility to innocent meaning does not in itself preclude a finding that an ordinary reader would understand it in a libelous sense."). We conclude that CSC's complaint sufficiently alleges the existence of a defamatory meaning.

***Church of Scientology,*** 744 F.2d at 696-97 (citations modified) (footnotes omitted).

¶29. In the present case, the overall structure of the disputed articles, especially the prominence of the tagline which emphasized the false fact that McCullough owned one of the seized vehicles, could reasonably create an implication in the mind of the reader that the plaintiff was somehow connected to illegal drug activity. Thus, a reasonable jury could find that the statements were false and defamatory.[7]

c.

¶30. The defendants argue that even if the plaintiff were able to present a jury issue concerning falsity and defamatory meaning, the case would still fail. When the person allegedly defamed is a public official or a public figure, liability may not be imposed for an otherwise actionable publication unless the statements complained of was made with "actual malice," that is, "with knowledge that is was false, or in reckless disregard of whether it was false or not." ***New York Times**,* 376 U.S. at 280. A reckless disregard for the truth requires more than a departure from reasonably prudent conduct. "'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'"***Harte-Hanks Communications, Inc. v. Connaughton,*** 491 U.S. 657, 688 (1989) (quoting ***St. Amant v. Thompson,*** 390 U.S. 727, 731 (1968)). The standard is a subjective one--there must be sufficient evidence to permit the conclusion that the defendant actually had a "high degree of awareness of . . . probable falsity.'" *Id.* (quoting ***Garrison v. Louisiana,*** 379 U.S. 64, 74 (1964))).

¶31. Thus, "[h]atred, ill will, malice in the common law sense is not enough." ***Meridian Star,*** 549 So. 2d at

1334-35 (citing *New York Times,* 376 U.S. 254)). *See also **Ferguson,*** 448 So. 2d 271; ***Gulf Publ'g,*** 434 So. 2d at 695. "[A] public figure plaintiff must prove more than an extreme departure from professional standards and that a newspaper's motive in publishing a story--whether to promote an opponent's candidacy or to increase its circulation--cannot provide a sufficient basis for finding actual malice." ***Harte-Hanks,*** 491 U.S. at 665. Personal spite, even an intent to do injury to the plaintiff, will not suffice to establish constitutional fault. ***Id.*** at 666 n.7; ***Beckley Newspapers Corp. v. Hanks,*** 389 U.S. 81, 82 (1967); ***Garrison v. Louisiana,*** 379 U.S. at 73 ("even where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood. Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred").

¶32. In ***Harte-Hanks,*** a candidate for a municipal judgeship conducted a tape-recorded interview with a witness who made bribery allegations against the incumbent judge's court administrator. Based on this interview and the allegations, the candidate filed a complaint against the court administrator who was subsequently arrested, indicted by a grand jury and convicted. ***Harte-Hanks,*** 491 U.S. at 668-69. A grand jury witness who had been at the interview subsequently went to a local newspaper's editorial director and told him that the candidate had stated that his purpose in conducting the tape-recorded interview was to force the incumbent court administrator and judge to resign and that the candidate had promised her and the tape-recorded interview witness favors in return for their help in the investigation. The newspaper, which supported the re-election of the incumbent judge, thereafter published an article quoting the grand jury witness as saying that the candidate had used "dirty tricks" to gain her cooperation and reporting that the candidate had offered her and the other witness vacations, jobs and other favors "in appreciation" for their help. ***Id.*** at 680. The newspaper did not question the tape-recorded interview witness or listen to available tape recordings of the candidate's interview with her before publishing the story. ***Id.*** at 692.

¶33. The candidate brought a libel action in federal district court. At trial, evidence was introduced sufficient to support a jury finding that the defendant newspaper was biased in favor of the incumbent as evidenced by the favorable coverage of the incumbent and the unfavorable coverage of the candidate, that the defendant newspaper intentionally avoided interviewing the tape-recorded witness who could have either credited or discredited the story, that the defendant newspaper knew that publication of the allegations would completely discredit and irreparably damage the candidate personally, politically and professionally, and that the defendant newspaper timed the release of the article to peak immediately before the election in an effort to maximize the article's discrediting effect. ***Id.*** at 689-90 n.36. The jury determined that the article was false and defamatory and that the plaintiff had proved by clear and convincing evidence that it was published with actual malice. ***Id.*** at 661. The court of appeals, after conducting an independent examination of the record, affirmed the judgment. ***Id.*** at 662.

¶34. The Supreme Court also affirmed the judgment, holding that there was sufficient evidence to support the jury's determination that the defendant newspaper published the article with actual malice. Central to the Court's holding, however, was the evidence which showed that the newspaper had reason to believe, before the story was published, that the various allegations by the grand jury witness were false. ***Id.*** at 690-91. This evidence included the fact that the candidate himself and five other witnesses had denied the grand jury witness's charges before the story was published; the fact that the most serious charge was rendered "not only highly improbable, but inconsistent" with actions that had been taken by the candidate; and the fact that the "hesitant, inaudible and sometimes unresponsive and highly improbable tone of [the grand jury

witness]'s answers to various leading questions raise[d] obvious doubts about her veracity." *Id.* at 691. Moreover, the newspaper had interviewed the candidate prior to publication and had misconstrued his unambiguous denials of the charges as confirmation of the factual basis of the charges. *Id.*

¶35. Finally, despite the fact that the tapes of the original tape-recorded interview were made available and that the newspaper was aware that this original witness was key to determining the truth or falsity of the allegations against the candidate, no one from the newspaper listened to the tapes or made an effort to interview this witness. *Id.* at 692. The Court concluded:

> Accepting the jury's determination that petitioner's explanations for these omissions were not credible, it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges. Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category.

*Id.* (citation omitted).

¶36. The Court also noted that the case before it was remarkably similar to *Curtis Publ'g Co. v. Butts,* 388 U.S. 130 (1967). There, the defendant newspaper published an account of an unreliable informant's false description of a Georgia athletic director's purported agreement to fix a college football game. The *Harte-Hanks* Court noted that in both cases there was reason to question the informant's veracity, yet the editors did not interview other witnesses who had access to the same facts as the informant or seek other evidence which could have revealed what actually happened. The Court concluded that this evidence of an intent to avoid the truth was sufficient to satisfy the *New York Times* standard. *Harte-Hanks,* 491 U.S. at 693.

¶37. This Court applied the actual malice standard in *Stegall*. There, J.P. Stegall, a candidate for supervisor in Pontotoc County, filed a defamation suit alleging that a television reporter had knowingly issued a false broadcast about him on the day of the primary election. *Stegall,* 609 So. 2d at 349. Mary Evelyn Jones, a deputy circuit clerk of Pontotoc County, swore in an affidavit that Cathy Coggin, the reporter, had called her around 12:30 p.m. on election day and asked about the candidates. Jones stated that Coggin had specifically asked whether J.P. Stegall was the incumbent and had been indicted.[8] Jones stated that she informed Coggin twice that J.P. Stegall was not the incumbent and had not been indicted, and that it was Bobby Dean Stegall who had been a supervisor and had been indicted. Coggin denied having had this conversation with Jones. The television station aired a story that afternoon in which Coggin stated that J.P. Stegall had been arrested, had pled guilty and had pulled out of the race. *Id.* at 350. The station issued retractions the next day after learning of the error. Stegall survived the primary election that day but later lost in the run-off.

¶38. The trial court granted summary judgment in favor of the defendants on the ground that there was insufficient evidence of actual malice. *Id.* at 349. This Court reversed, holding that Stegall had sufficient evidence of actual malice:

The evidence in the record *sub judice* could support a reasonable jury finding that Stegall has shown actual malice by clear and convincing evidence. If taken as true, the affidavit of Mary Evelyn Jones would show that Coggin knew the truth of Stegall's innocence or had been informed of the truth just a few hours prior to the broadcast. The jury must determine if this was because of her own disregard of the information. . . . If taken as true, the testimony of Mary Evelyn Jones would show that Coggin had specifically asked about an indictment of Stegall and was told more than once by Mary Evelyn Jones that Stegall had not been indicted . . . .

*Id.* at 352. Thus, there was a conflict in testimony as to whether or not the reporter had been informed that the information was false prior to broadcast. If this testimony were believed, a reasonable jury could find that actual malice on the part of the defendant had been shown by clear and convincing evidence.

¶39. In the present case, McCullough argues that there is sufficient evidence to support a jury finding that he has proved by clear and convincing evidence that Scott wrote the July 16th and July 17th articles with actual malice. McCullough maintains that Scott and the Journal were not in favor of McCullough as an elected official. Scott had written and the Journal had printed numerous articles in the past publicizing McCullough's indictment with Gladney in federal court as well as other stories concerning McCullough.[9] McCullough asserts that Scott based some of his past articles on information received from McCullough's political enemies and was "tipped off" about the stories in question by someone who admittedly did not like McCullough. Scott and his editor, Sid Harrison, had both testified that a story about the drug bust which mentioned McCullough would probably have been published even if the truck had not been seized, since McCullough had a past relationship with Gladney.

¶40. McCullough further asserts that there is evidence from which a jury could conclude that Scott and the Journal did not care whether the articles were true or not. Scott admitted that he knew that the article would seriously damage McCullough's reputation. Scott admitted that it was a good journalistic practice, where possible and relevant, to verify information with at least two other sources, although he also said that it was often acceptable to rely on one source where that source is a district attorney, sheriff or other public official. The jury could reasonably determine that although Scott knew the article would have damaging effects upon McCullough's reputation and knew where to contact him, Scott did not go to see McCullough or otherwise verify the truth of the information. Finally, the plaintiff points out in his brief that a reasonable jury could conclude that Scott lied about attempting to call McCullough at his offices.

¶41. When determining the propriety of a motion for a directed verdict, this Court, like the circuit court, is required to consider the evidence in a light most favorable to the plaintiff, giving him the benefit of every favorable inference which reasonably may be drawn from the evidence. *See, e.g.,* [Wallace v. Thornton, 672 So. 2d 724, 727 (Miss. 1996)](#). While all of the foregoing evidence could be taken as true, however, it is not sufficient to establish actual malice under the standard dictated by *New York Times.* The defendants may well have been opposed to McCullough politically. They may have been responsible for publishing unfavorable stories about him in the past. Scott may have been tipped off by McCullough's political enemy, and Scott may have published a story linking McCullough to Gladney even if the truck had not been seized. Scott was undoubtedly aware that the articles would not be good for McCullough's political career, and it is almost certainly true that he could have more diligently pursued verification of the truck's ownership. Taken together, however, this evidence amounts to no more than "hatred, ill will, malice in the common law sense,"

which is not enough. *Meridian Star,* 549 So. 2d at 1334-35. *See also **Ferguson,*** 448 So. 2d 271; ***Gulf Publ'g,*** 434 So. 2d at 695. A public figure plaintiff such as McCullough must prove more than an extreme departure from professional standards or personal spite on the part of the defendants. ***Harte-Hanks,*** 491 U.S. at 665 & 666 n.7; ***Beckley Newspapers,*** 389 U.S. at 81-82; ***Garrison,*** 379 U.S. at 73. A public figure plaintiff must prove actual malice. ***Harte-Hanks***, 491 U.S. at 666.

¶42. McCullough argues, however, that there is evidence from which a reasonable jury could determine that Scott actually had some suspicion about the information which appeared in the articles. McCullough asserts that a jury could conclude that Cook's refusal to give Scott the names of the owners of the seized vehicles raised suspicion in Scott's mind about the ownership of the truck. Moreover, McCullough argues that Scott had seen McCullough driving a new GMC truck and had never seen him in the 1978 Ford which was seized in the bust. Scott knew the tag on the seized truck had been expired for more than a year. Scott had never before run a computer check on the NCIC system (although he "knew how it was done"); and therefore, McCullough claims Scott had no past experience from which to conclude that the information was always true. McCullough asserts that the NCIC records themselves demonstrate "that there is usually a lag time between the sale of a vehicle and the re-issuance of the title in the purchaser's name." Finally, McCullough points to Scott's notes which he wrote as he was investigating the story on July 15th, in which the designation of "Earl" appears by the Ford truck. He claims that despite Scott's testimony that the designation indicated that the truck was confiscated from Earl Gladney's home, a reasonable jury could determine that it indicated ownership.

¶43. Even if Sheriff Cook's "refusal" to give Scott the names of the vehicles' owners should have alerted Scott that something out of the ordinary was happening, there was no evidence that Scott, after retrieving the official state Tax Commission records showing that McCullough was the titled owner of the vehicle, had any reason to further suspect the accuracy of this information and, more importantly, that he did in fact subjectively suspect inaccuracy. It is also difficult to imagine why an expired tag, or the fact that Scott had seen McCullough driving a different truck in the past, should have caused Scott to doubt the veracity of the records; neither of these pieces of evidence are inconsistent with the proposition that McCullough owned a truck which he allowed someone else to drive. In fact, for a period of several months this was a true state of affairs . As to Scott's lack of firsthand experience with the NCIC system, this suggests at most that he imprudently trusted the accuracy of information gathered from a source with which he was not completely familiar. Considering that the check was run by a law enforcement agency, however, and that the records are maintained by the Tax Commission, Scott's reliance on the result--that the vehicle was titled in McCullough's name--did not constitute such a reckless disregard of the probable truth as to infer substantive doubt as to the truth of the story.

¶44. Additionally, in ***Harte-Hanks*** and ***Stegall*** there was evidence that the reporters had been expressly informed before publication that the information they possessed was not true. In the present case, Scott testified that the only information he got from the source that tipped him off was that "he ought to call the sheriff" and that he had "better investigate this drug bust." The caller mentioned nothing about the truck. Scott then called Sheriff Cook, who gave him the tag numbers of the confiscated vehicles. It is undisputed that Cook gave Scott no information on who owned the seized vehicles. The plaintiff, in fact, steadfastly maintained that Cook did *not* give Scott this information.[(10)] Scott took the tag numbers to another law enforcement agency and had them run on the NCIC system, which revealed that McCullough was the owner of the truck. A more careful reporter might have routinely checked the accuracy of such information with other sources, and there is a factual dispute about whether Scott attempted to call McCullough at his

offices. It is undisputed, however, that Scott and McCullough never talked before the article was published. Additionally, there is no evidence that any other person gave Scott reason to doubt the veracity of the records accessed on the NCIC system.[(11)]

¶45. We are left with only two pieces of evidence which purportedly show that Scott entertained serious doubt about whether McCullough owned the truck. First, as McCullough points out, the records which Scott accessed showed that McCullough had purchased the Ford truck on March 28, 1978, but showed that title had issued on May 9, 1978. Thus, if Scott had carefully checked this information, he could have deduced that there is generally a delay between the date of purchase and the date of title issuance and that a similar delay might be a factor in his investigation of the truck's current ownership.

¶46. Where there is evidence that a reporter has knowledge of certain facts which are inconsistent with information not yet published, or which render that information "highly improbable," those facts can be said to "raise obvious doubts" about the veracity of the reporter's information. *Harte-Hanks,* 491 U.S. at 691. *See also Stegall,* 609 So. 2d at 352. There is no evidence here to suggest, however, that Scott noticed or was even exposed to the record of the delay between the purchase date and the title issuance date of McCullough's original purchase of the truck. Even if he had, knowledge of this general "lag time" does not make it "highly improbable" that McCullough still owned the truck.

¶47. Second, McCullough points to Scott's handwritten notes of his investigation on July 15th. In these notes, each seized vehicle is listed along with the license number and a name designation next to each vehicle.[(12)] These three pieces of information for each vehicle were written in black ink while Scott was on the phone with Sheriff Cook. Scott later wrote the names of the owners of the vehicles as they appeared in the NCIC records in red ink.

¶48. Scott testified at trial that the designation "Earl" by the Ford truck refers to the fact that the vehicle was confiscated from Earl Gladney's home. McCullough argues that this designation might refer to ownership. Both Cook and Scott testified, however, that Cook told Scott the location from which each vehicle was seized. Cook did not tell Scott who the owners were. Thus, considering that the designation "Earl" was written down during Scott's conversation with Cook, all the available evidence supports Scott's claim that the designation refers to the location of seizure. His claim is also supported by the text of the July 16th article, in which Scott recounts that "[t]he truck registered to McCullough was confiscated from Gladney's mobile home in Van Vleet, Cook said."

¶49. We conclude that the record in the present case does not support a reasonable jury finding that the plaintiff showed actual malice by clear and convincing evidence. *See Stegall,* 609 So. 2d at 352 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255-56 (1986)). The testimony at trial was rife with suggestions that Scott could have and should have been more thorough. There is nothing which shows, however, that Scott or the Journal actually harbored any serious pre-publication doubts about the accuracy of the statements contained in the disputed articles. *See New York Times,* 376 U.S. at 287 (state of mind required for actual malice must be "brought home" to the persons having responsibility for the publication of the false statements). Thus, the plaintiff presented no genuine issue of whether the defendants acted with knowledge of the falsity of the statements in the articles or in reckless disregard of whether the statements were true or false. *Id.* at 279-80. The trial court erred by not directing a verdict for the defendants and by denying their JNOV motion.

¶50. For the foregoing reasons, the judgment of the circuit court is reversed, and judgment is rendered here

for the defendants finally dismissing McCullough's complaint and this civil action with prejudice.

¶51. **REVERSED AND RENDERED.**

**SULLIVAN AND PITTMAN, P.JJ., AND WALLER, J., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION. PRATHER, C.J., McRAE, MILLS AND COBB, JJ., NOT PARTICIPATING.**

**SMITH, JUSTICE, DISSENTING:**

¶52. The majority, relying upon *Stegall v. WTWV, Inc.,* 609 So. 2d 348 (Miss. 1992) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255-56, 279-80 (1986)), concludes that McCullough presented no genuine jury issue of whether the defendants acted with knowledge of the falsity of the statements in the articles or in reckless disregard of whether the statements were true or false. *See also Franklin v. Thompson,* 722 So. 2d 688, 692 (Miss. 1998). Thus, the majority finds that the circuit judge erred in failing to grant a directed verdict to the defendants.

¶53. Under *Stegall,* a public official has the option of proving one of two factors in order to present a genuine issue of fact for jury determination. In *Stegall*, the plaintiff failed to overcome the factor which would require a showing that the defendant acted with knowledge of the falsity of their article. However, in the case at bar, the situation is totally different when considering from the evidence submitted whether or not the jury could have found that the defendants' article was written in reckless disregard of whether the statements were true or false. In my view, McCullough presented more than adequate evidence concerning defendants' reckless disregard of the truth of the article to raise a genuine issue for jury determination. Therefore, I respectfully dissent.

¶54. In considering the issue of granting a directed verdict in favor of the defendants, this Court is required to consider the evidence in the light most favorable to the plaintiff. Before finding the evidence insufficient to support the jury's verdict, this Court must find that given "the evidence as a whole, taken in the light most favorable to the verdict, no reasonable hypothetical juror could have found as the jury found." *Snapp v. Harrison,* 699 So. 2d 567, 569 (Miss. 1997); *Starcher v. Byrne,* 687 So. 2d 737, 739 (Miss. 1997). The plaintiff is afforded every favorable inference which reasonably may be drawn from the entirety of the evidence before the jury. *Wallace v. Thornton,* 672 So. 2d 724, 727 (Miss. 1996); *see also Misso v. Oliver,* 666 So. 2d 1366, 1375 (Miss. 1996).

¶55. An examination of McCullough's evidence is required to determine whether it is sufficient to withstand a directed verdict. On July 15, 1991, Sheriff Mack Cook and deputies arrested Earl and Gail Gladney, among others, and seized five vehicles. One of the vehicles, a Ford truck, had been sold to Gladney by McCullough on June 24, 1991. McCullough executed and transferred the title to the truck on that date. The truck had an expired February 1990 tag at the time of sale because McCullough had not been driving it on public roads. While in route to the jail, Gail Gladney told Sheriff Cook that Earl had bought the truck from McCullough. Sheriff Cook furnished the tag number of the seized vehicles to Sid Scott, a reporter with the *Daily Journal*, who wrote the story at issue. Cook told some local reporters who were waiting at the jail that Gladney was the owner of the truck at issue. He did not tell Scott, but rather only gave Scott the tag

numbers of the vehicles. Scott heard about the drug bust from a source that he knew "didn't like McCullough." Scott took the tag numbers to a law enforcement agency and checked them against the records of the State Tax Commission on the National Crime Information Center terminal (NCIC), in violation of 8 U.S.C. § 534. Scott admitted at trial that he had never requested an NCIC check before and was aware that you may not always get accurate information from such computer check. Scott testified that the information he observed on the computer when he requested the NCIC check was probably identical to the computer printout introduced into evidence as Exhibit D-69, which clearly showed a lag time existed between the date of a sale of a vehicle and the date on which a new title is issued by the State Tax Commission in Jackson. McCullough argues that because of the obvious lag time, this should have given Scott reason to doubt the veracity of the information.

¶56. When McCullough learned about the situation that was unfolding, that very day he checked on the status of the ownership on the truck in question with the Tax Assessors Office of Chickasaw County, which also had access to the same NCIC system which Sheriff Cook and Scott claimed to have used. That office immediately produced a computer record, exhibit P-16, which showed Gladney owned the truck and that he purchased it on June 24, 1991. McCullough told Cook about the document from the tax assessor's office and demanded that Cook correct any misinformation given to the media concerning the Ford truck. Cook responded that he was only doing his duty. Although Cook called other reporters and corrected the ownership misinformation, he did not call Scott. Cook ran his second NCIC check at 7:56 a.m. on July 16th and noted that the titled owner was Gladney. Sometime between 5:04 p.m. on July 15th, and 7:56 a.m. on July 16th the State Tax Commission records were updated to show Gladney as the titled owner of the truck.

¶57. Scott had called McCullough or had come to his office in the past to question him about other issues and articles which he had reported in the *Daily Journal.* However, on this date Scott did not speak with McCullough or go see him. These prior articles concerned federal indictments with Gladney and alleged ethics violations which resulted in charges brought against McCullough by the Attorney General's Office. These numerous prior articles were unfavorable to McCullough. All of these allegations of criminal actions and misconduct were later dismissed in favor of McCullough.

¶58. During his deposition, Scott claimed that he attempted to call McCullough's office on the afternoon of July 15th, but that no one answered the phone. At trial, Scott claimed that he tried to call twice during business hours, but no one answered. An employee of the Chancery Clerk's Office, Jo Mixon, testified however, that she was in the office on July 15th, that the phone was not unanswered during business hours, and that McCullough could have been reached at the office that day.

¶59. Scott wrote the article which appeared in the *Daily Journal* on July 16th, headlined: "Chancery Clerk's Truck Seized: Five Arrested in Chickasaw County Drug Bust." The article's most pertinent parts stated: "A three-month-long drug investigation in Chickasaw County led to the arrest of five people Monday morning, and the confiscation of a truck owned by Chancery Clerk Derwood McCullough. McCullough couldn't be reached for comment Monday to explain why his truck was at the scene of the drug bust. McCullough and Gladney, also known as E.G. Harris, have been linked before on suspected criminal charges."

¶60. Sometime later on July 16, 1991, Scott received information from the Associated Press that he should check out his story because there might be something incorrect about it. In fact, Scott did call McCullough

on that date, asked McCullough if he owned the truck and McCullough responded that he did not own it. McCullough told Scott that he should not print things which were not true and that someone might wrongfully accuse Scott of something in the future. Scott responded that he was tired of McCullough's Sunday School lessons and that McCullough should not "cross swords with somebody that can buy printer's ink by the barrel." McCullough inferred from Scott's comments that he didn't care whether his articles were true or not. McCullough then mentioned that he might sue Scott. Scott replied that he and his newspaper had some pretty good lawyers.

¶61. On July 17th, 1991, the *Daily Journal* published another article entitled, "Clerk: Truck sold before drug bust." Again, the article referred to "McCullough and Gladney, also known as E.G. Harris, have been linked before on suspected criminal charges."

¶62. July 19, 1991, was the qualifying deadline for election to public office. McCullough did not qualify to run again for Chancery Clerk claiming that the articles damaged his reputation and caused him personal humiliation, as well as emotional distress.

¶63. At trial, Scott admitted that it was good journalistic practice to verify the truth of information by checking with two other sources. However, he did not check other sources, including the Tax Assessor's Office of Chickasaw County, nor did he attempt to question any of those persons arrested regarding the Ford truck seized at the Gladney's home. He did not attempt to talk with Sheriff Cook again regarding the circumstances, and Cook did not tell Scott that the Gladneys had already told Cook that Earl owned the Ford truck, not McCullough. More importantly, both Scott and Bobby Harrison, the *Daily Journal* editor, testified that **McCullough would have been mentioned in the July 16, 1991 article even if the Ford truck had not been confiscated**. And, the question is thus posed, - why? It is more than noteworthy that the Ford truck is the only factor in this case which could possibly link McCullough to the drug bust at the Gladney's on July 15th. How then could Scott and the *Journal* have been legitimately justified in writing an article and still mentioning McCullough to a drug bust on July 15th? Harrison testified that the *Daily Journal* determined that the drug story was "another case where Earl Gladney and Derwood McCullough are linked." Scott also admitted that when he wrote the article he realized that it would stigmatize and damage McCullough, if not end, his political career. Scott also testified that he had seen McCullough driving a new GMC truck and had never seen him driving the Ford truck. Thus, the answer to the question becomes rather obvious: Could not a reasonable jury have inferred and concluded that, in spite of knowing all of this information, and considering Scott's statements made directly to McCullough concerning the truth of the articles and that McCullough should not get into disputes with people who could buy barrels of ink, as indicative that Scott and the *Daily Journal* did not care whether their news articles were true or not.

¶64. The majority maintains that the article is basically the truth. This statement needs close evaluation. Contrary to such claim, the headline and the text of the statement, that the seized Ford truck was owned by McCullough, is totally false. On July 15, 1991, McCullough did not own the truck. There was simply an expired February 1990 tag on the truck which was registered in McCullough's name at the State Tax Commission. Ownership of the truck passed from McCullough to Gladney at the time McCullough endorsed and delivered the certificate of title to the vehicle on June 24, 1991. Miss. Code Ann. § 63-21-31(1) (1996); *see Hicks v. Thomas*, 516 So. 2d 1344, 1346 (Miss. 1987). In *Hicks*, this Court, referring to the above statute, clearly delinated the method wherein ownership of a vehicle is transferred to another person by holding that, "That statute accepts certainty of title as our primary value, and provides a simple method for transferring title to motor vehicles--**endorsement and delivery to the transferee of the title**

certificate."*Id.* (emphasis added). Any suggestion by the *Daily Journal* and the majority regarding other prior connections between McCullough and Gladney are sufficient to make the story true, thus enabling a way around this flaw in their theory, simply will not fly. Any way you look at this case, the statement of ownership as the truck being McCullough's in the article is false, and that is all that links McCullough to this drug bust. Worst yet, the article's references to prior suspected criminal activity linking McCullough with Gladney could lead some reader unfamiliar with the prior news articles written about McCullough, to believe that the two were linked to drugs. The article is aimed more at McCullough than the Gladneys, who were actually the ones apparently charged with drug violations.

¶65. The majority has adequately covered the law regarding libelous defamation, therefore, there is no need to further that inquiry. But, we must examine the entirety of the article and the gist of that article. The clear implication and intent of the article is to link McCullough to the drug bust. The article also stated that McCullough couldn't be reached for comment, a hotly disputed fact at trial, and that McCullough's comment was needed "to explain why his truck was at the scene of the drug bust." The average fifth grader would not have to study this article very long nor engage in conjecture or speculation to determine the implications of the article as being primarily aimed at McCullough and that such implication would severly damage McCullough's reputation. Yes, even to the point of ending his political career, as admittedly recognized by Scott and Harrison prior to ever publishing this article.

¶66. Unquestionably, McCullough was a public official at the time. This Court has held that where the plaintiff is a public figure, the plaintiff must prove that the defendants wrote or published the language with actual malice. *Franklin v. Thompson,* 722 So. 2d at 692; *Eselin-Bullock & Associates Insurance Agency, Inc. v. National General Insurance Co.,* 604 So.2d 236, 241 (Miss. 1992). Even though I would maintain that the basic claim of the ownership of the truck as being McCullough's is false, nevertheless, even if true as claimed by the majority and the newspaper, the gist of the entire article as aimed at McCullough is wrong. The *Eselin* Court further held that statements are considered false under our defamation law if the underlying implication of the statement is false. *Id.* at 241. In W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 116, at 117 (5th Ed. Supp. 1988), we find that a defendant who has created a defamatory implication by omitting pertinent facts may be held liable for defamation even though the facts stated by the defendant are true. The "gist" of the article should also be considered in determining liability. *See Gannet Co. v. Re,* 496 A.2d 553, 557 (Del. 1985); *McIlvain v. Jacobs*, 794 S.W.2d. 14, 16 (Tex. 1990). Here, even if one were to accept the premise that the details of the headline and text were true but the gist of the article is wrong, liability may still be imposed upon a defendant. *Id.* But, in actuality, the headline, the text and the overall implication or "gist" of this entire article are all false. There were more than sufficient "red flags" indicating obvious reasons for Scott to doubt the truthfulness and accuracy of his source information prior to publication and that is sufficient to establish reckless disregard. *Harte-Hanks Communication, Inc. v. Connaughton,* 491 U.S. 657, 688 (1989). In *Stegall*, this Court determined that the reporter's actions could be interpreted by a juror to constitute actual malice and noted that "Since [the reporter] did not check the story's authenticity, a jury could find that she simply didn't care about its truthfulness or intended to make false statements about [the plaintiff]." *Stegall*, 609 So.2d at 352. Here, there was no attempt to double check the story's authenticity as admitted by Scott.

¶67. In my view, considering all of the above evidence in the light most favorable to the McCullough, a reasonable juror could have found more than sufficient evidence that this article was written with malice by "reckless disregard," from both omissions from the article of known facts, failure to check sources

adequately, conflicting testimony as to whether Scott may have lied about certain facts, comments by Scott to McCullough that he was tired of McCullough's Sunday School lessons (concerning only printing the truth) , that McCullough should not get into it with someone who had barrels of ink, and that the *Journal* would have mentioned McCullough in the article anyway regardless of the seizure of the Ford truck. The "gist" of these articles was aimed at McCullough, regardless of the truth. The learned trial judge correctly denied a directed verdict and the majority is in error in reversing and rendering this case. The verdict of the jury should stand.

¶68. I respectfully dissent.

1. McCullough also alleged that Martin "Mack" Cook, the former sheriff of Chickasaw County and a co-defendant in this case, libeled him by providing incomplete information to Sid Scott and Journal Publishing Company. Cook was originally granted summary judgment, which was reversed and remanded by this Court. *See* **McCullough v. Cook,** 679 So. 2d 627 (Miss. 1996). The jury in the instant case returned a verdict in favor of Cook.

2. This computer system is used by law enforcement to verify information on vehicles. The information accessed on Mississippi vehicles is maintained by the Mississippi State Tax Commission.

3. Another check of the truck's tag number that same afternoon produced the same results. Exhibit D-69 is a copy of an NCIC check run at "196/17.04 91," which translates to July 15, at 5:04 p.m., 1991. This second tag check was run by Cook later on the same day after receiving an angry phone call from McCullough, to see whether the information he had received earlier was still accurate.

4. Scott refused at trial to disclose the identity of the source that tipped him off about the bust. He admitted only that it was someone that he knew "didn't like Mr. McCullough."

5. This was the basis of the plaintiff's claim against Sheriff Cook: that Cook knew or should have known that merely giving the tag numbers to Scott would cause Scott to do an NCIC check on the tags and conclude (erroneously) that McCullough still owned the truck. *See McCullough v. Cook,* 679 So. 2d at 629. The jury found for Cook on this claim.

6. By coincidence, the State Tax Commission records were updated sometime after 5:04 p.m. on July 15, when Sheriff Cook had run his second NCIC check showing McCullough as the titled owner of the truck. The next morning at 7:56 a.m. Cook ran the same check, and this time it showed Gladney as the titled owner. The issue date for the title was listed as "07-15-91." The truck was still registered to McCullough as late as January 6, 1997.

7. McCullough also claimed that the portion of the article which stated that he and Gladney had been linked "before" on suspected criminal charges implied that they were linked *now* in illegal drug activity. This claim, standing alone, has no merit. The statement that McCullough and Gladney were linked in the past was substantially true, as McCullough and Gladney had been indicted together and were the co-owners of a business which was involved in the previous charges. It would be hard to imagine a way to state this truth without using the word "before" or other similar term. Any defamatory implication that McCullough was linked to present drug activity was chiefly due to the false statement that he owned a truck which was seized at the scene of a bust.

8. J.P. Stegall's cousin, Bobby Dean Stegall, had previously held the post but resigned after being arrested

and indicted as a result of an FBI undercover investigation. *Stegall,* 609 So. 2d at 349.

9. In connection with the federal charges, which were ultimately dismissed, McCullough had been suspended by the County Board of Supervisors from his board-appointed duties. The Mississippi Attorney General also filed a suit in July of 1990 calling for McCullough's removal from office on conflict of interest charges. This suit was also ultimately dismissed. The *Daily Journal* reported on the dismissals of the lawsuits and McCullough's reinstatement to his board-appointed jobs. The overall coverage of these stories seems fairly balanced, though not always favorable to McCullough.

10. As already noted, this formed the basis of McCullough's claim against Cook.

11. Had any other witness testified from personal knowledge that Scott knew the truth or had serious doubts about the ownership of the truck--even if that testimony had contradicted that of Scott and Cook--a jury question would arise. Credibility determinations are reviewed under the clearly erroneous standard because the trier of fact has had the "'opportunity to observe the demeanor of the witnesses.'" *Harte-Hanks,* 491 U.S. at 688 (quoting **_Bose Corp. v. Consumers Union of United States, Inc.,_** 466 U.S. 485, 499-500 (1984)). *See also **Stegall,*** 609 So. 2d at 352-53. Here there was no such testimony, only an assertion by McCullough that Scott might have or should have entertained doubts about the accuracy of his information.

12. These read as follows: "Dodge--Earrey"; "Ford--Earl"; "Old--Evans"; and "Caddy--Earl."